# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIKE V. MATA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-423 (KAJ) |
| | ) | |
| E. I. DU PONT DE NEMOURS AND | ) | |
| COMPANY, a Delaware corporation; | ) | |
| E. I. DU PONT DE NEMOURS AND | ) | |
| COMPANY, Plan Administrator; and | ) | |
| PENSION AND RETIREMENT PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### VOLUME I

POTTER ANDERSON & CORROON LLP
Kathleen Furey McDonough (I.D. 2395)
Sarah E. DiLuzio (I.D. 4085)
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Telefax: (302) 658-1192
kmdonough@potteranderson.com
sdiluzio@potteranderson.com
*Attorneys for Defendants*

Dated: May 1, 2006
730195

## TABLE OF CONTENTS

Exerpts from the Deposition Transcript of Mike V. Mata, dated 03/16/06 ............................ A1-A46

Pension Estimate, dated 01/23/04 ................................................................................................ A47-A52

Summary Plan Description, dated 07/98 .................................................................................... A53-A82

Excerpts of Pension and Retirement Plan (originally adopted 09/01/1904;
last amended 03/01/98) ................................................................................................................. A83-A104

E. I. du Pont de Nemours and CompanyContinuity of Services Rules (originally
adopted 06/02/1919; last amended 03/01/97) ...................................................................... A105-A111

Dupont Employee Status Sheet of Mike V. Mata ................................................................... A112

Revised memorandum from George Hollodick, dated 10/22/91 re:
DuPont Automotive Products Nason Acquisition ................................................................... A113-A115

Memorandum from G. A. Hollodick to F. J. Hutz, dated 10/28/91 re:
Recognition of Nason Service for DuPont Plans and Policies ............................................ A116-A118

Letter to Mike V. Mata, dated 01/31/00 re: Adjusted Service Date ................................... A119

Letter to All Nason Employees, dated 10/31/91 ..................................................................... A120

Letter to Nason Employees, dated 09/25/92 ............................................................................ A121

Level 1 Appeal Initiation Form, dated 05/31/05 .................................................................... A122-A124

Letter from Mike Mata to DuPont Determination Review Team, dated 05/31/05 ........... A125-A126

Letter from Mike Mata to E. I. DuPont de Nemours and Company, dated 06/01/05 ........ A127

Letter from Andrew F. Lesser to Mike Mata, dated 06/10/05 .............................................. A128

Letter from Andrew F. Lesser to Mike Matta, dated 06/22/05 ............................................ A129

Letter from DuPont Benefit Determination Review Team to Mike Mata,
dated 06/28/05 ................................................................................................................................ A130-A131

Letter from Mike Mata to Dupont Determination Review Team, dated 07/25/05 ........... A132-A134

Decision of the Board of Benefits and Pensions, dated 09/27/05 ........................................ A135-A137

Expression of Interest of Mike Mata, dated 04/21/04.............................................A138

Plaintiff's First Set of Interrogatories Directed to Defendants, dated 02/24/06 ..............A139-A140

Affidavit of Andrew F. Lesser, dated 05/01/06.................................................A141-A142

Mike V. Mata                                                    March 16, 2006

Wilmington, DE

Page 1

1               IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
2       --------------------------------X
        MIKE V. MATA,                    :
3                                        :
            Plaintiff,                   :
4                                        :    C.A. No.
            v.                           :    05-423 (KAJ)
5                                        :
        E.I. DU PONT DE NEMOURS AND      :
6       COMPANY, a Delaware corporation; :
        E.I. DU PONT DE NEMOURS AND      :
7       COMPANY, Plan Administrator; and :
        PENSION AND RETIREMENT PLAN,     :
8                                        :
            Defendants.                  :
9       --------------------------------X

10

11

12               Deposition of MIKE V. MATA, taken

13      pursuant to notice before Adam D. Miller,

14      Registered Professional Reporter and Certified

15      Shorthand Reporter, in the law offices of Potter

16      Anderson & Corroon LLP, Hercules Plaza, 1313

17      Market Street, 6th Floor, Wilmington, Delaware, on

18      Thursday, March 16, 2006, beginning at

19      approximately 1:52 p.m., there being present:

20

21

22                                      **A1**

23

24                              CERTIFIED COPY

25

Mike V. Mata

March 16, 2006

Wilmington, DE

1          MIKE V. MATA, having first been

2    duly sworn according to law, was examined and

3    testified as follows:

4                    - - - - -

5    BY MS. DiLUZIO:

6          Q.   Good afternoon, Mr. Mata.  We've met.

7    But I am Sarah DiLuzio, and I represent DuPont in

8    this action.  Have you ever been deposed before?

9          A.   No.

10          Q.   I'm going to go over some general

11    instructions with you.  Your counsel may well have

12    gone over the same thing with you.

13              But just for clarity's sake, I need

14    all your responses to be verbal.  The court

15    reporter here will take down everything I say,

16    everything you say.  And he can't record a shake

17    of the head or nod of the hand (sic).

18              If you're having trouble hearing

19    me, you need me to speak up, let me know.  If you

20    need a break for any reason, let me know.  We can

21    take a break.

22          A.   Okay.

**A2**

23          Q.   If I ask a question and you don't

24    understand it, please let me know.  I'll be happy

25    to rephrase it or repeat it, whatever you need.  I

1111 14th Street, NW Suite 400                         Washington, DC 20005

Page 8

```
 1        Q.    Okay.  Are there any other benefits --

 2        A.    No.

 3        Q.    -- that you would receive from this

 4   work?

 5              Okay.  Can you give me a sort of

 6   history of your employment from high school

 7   forward?

 8        A.    Yeah.  For my whole life, I've been in

 9   the auto body and fender collision repair

10   industry.  I had an apprenticeship of seven years.

11   And from 1970 through present, I've been a lot of

12   different hats but, basically, in the auto body

13   and fender industry.

14              15 years with DuPont as a product

15   development and troubleshooter, technical adviser,

16   a little bit of marketing, a lot of different

17   positions there.  And my trade is as an automobile

18   painter and somewhat of a body and fender guy.

19        Q.    Okay.

20        A.    So the only jobs I've had is in that

21   type of business.

22        Q.    Okay.  You were with a company called

23   Nason; is that correct?

24        A.    Yes.

25        Q.    When did that position begin?
```

**A3**

Page 9

```
 1          A.    In May of 1989.

 2          Q.    And how long were you with Nason?

 3          A.    I was with Nason for approximately 2.6

 4    years, until DuPont --

 5          Q.    Okay.

 6          A.    -- purchased the corporation.

 7          Q.    And what was your salary and/or wages

 8    while you were an employee of Nason?

 9          A.    It changed continually, but I believe I

10    started at 32,000 per year.  And then I had an

11    incentive program after that that I don't recall

12    exactly what that was.  I had, I had some sales

13    responsibilities got thrown in with my technical

14    work, and it was a 4 percent commission on

15    everything over quota.

16          Q.    Okay.  What was your position with

17    Nason?

18          A.    I was a technical service

19    representative for the western United States and

20    later on nationally and some international work.

21          Q.    Okay.  And what kind of company was

22    Nason?

23          A.    Nason was an automotive paint

24    manufacturing company.

25          Q.    Okay.
```

**A4**

Mike V. Mata                                                    March 16, 2006
                          Wilmington, DE

                                                               Page 12

1    given -- not offered jobs with DuPont --

2         Q.   So DuPont offered you a position --

3         A.   Yes.

4         Q.   -- with their company?

5         A.   Yes.

6         Q.   Did that require you to relocate?

7         A.   Not right away, no.

8         Q.   Okay.  So you continued to be based in

9    San Francisco?

10        A.   Yes.

11        Q.   And when did you move to Delaware?

12        A.   I moved to Delaware in March of 1994.

13        Q.   Did your position with DuPont change --

14   when you went from Nason to DuPont, did your

15   position change?

16        A.   Yes.

17        Q.   Can you tell me how it changed?

18        A.   Yes.  I was assigned to the marketing

19   manager by the name of Alan McConachie, and he was

20   my new boss.

**A5**

21        Q.   Okay.

22        A.   And we worked together in the

23   Brandywine Building.  And we had also worked

24   together in South San Francisco; just he came over

25   to Wilmington before me.  And my job was I did a

Mike V. Mata

March 16, 2006

Wilmington, DE

Page 20

1    with employment and benefit selection.

2        Q.    Okay.  And what's the date of this

3    document, sir?

4        A.    October 30th of 1991.

5        Q.    And did you receive this letter as a

6    Nason employee?

7        A.    Well, that's a, that's a double-edged

8    question there.  And I have two answers for it.

9    One is yes, because I have marked it "received."

10   But I did not receive it until 2004.  I did not

11   receive it in 1991.

12       Q.    How did you receive it in 1994 (sic)?

13   How did that come about?

14       A.    There's a gal by the name of Patty

15   Drysdale, who is our DuPont Performance

16   Coatings -- I guess you would call her the human

17   resources assistant administrator.  She works

18   directly for the human resource boss.

19              And I received this as a result of

20   my processing my retirement request.  And when I

21   found out that they said I can't have retirement,

22   this is when I received it.  She went into the

23   Nason file, plucked that out, and handed it to me,

24   along with one other document.                **A6**

25       Q.    So you did not receive this letter in

Mike V. Mata                                                    March 16, 2006

Wilmington, DE

Page 21

1    1991?

2         A.    No.

3         Q.    Do you see the fourth paragraph down,

4    sir, where there's, looks like the last sentence

5    of that paragraph is underlined?

6         A.    Yes, I do.

7         Q.    Is that an underline that you made?

8         A.    No.    That's Patty Drysdale's writing.

9         Q.    Okay.    Could you go ahead and read

10   those last two lines of that paragraph for the

11   record?

12        A.    Of the fourth paragraph?

13        Q.    Yes.    Starting with "it would also be

14   helpful."

15        A.    Okay.    It would also be helpful to

16   identify yourself as being in the Nason

17   acquisition since we are recognizing Nason's

18   service for most of our DuPont benefits.    The most

19   notable exception is DuPont's pension plan.

20        Q.    Okay.    When you received this document

21   in 1994 (sic), what did it mean to you?

22        A.    A horror and a shock.        **A7**

23        Q.    Did you understand this language to

24   mean that your Nason service would not necessarily

25   be recognized for purposes of the pension plan?

Mike V. Mata                                                    March 16, 2006
                          Wilmington, DE

Page 22

1          A.    Yeah.   I looked at it.   And I said,

2     It's made out to all Nason employees; and, yes, I

3     could see that, that this was going to be

4     something that was going to be a problem.

5                    (Exhibit 2 was marked for

6     identification.)

7     BY MS. DiLUZIO:

8          Q.    Okay.   Mr. Mata, the court reporter's

9     handing you what's been marked as Exhibit 2.   It

10    appears to be a letter dated September 25, 1992,

11    again, addressed to all Nason employee -- rather

12    this just says "Nason employees," from DuPont.

13                    Can you take a look at that?

14         A.    Yes.   I'm familiar with this document.

15         Q.    Okay.   And when did you receive this

16    document?

17         A.    I received this document, if I recall,

18    it was very close to the day or two -- either the

19    same day or the day after, right in there, as I

20    got -- Patty Drysdale handed me both these

21    documents.   I think it might have been even the

22    same day.

23         Q.    So you did not receive this in 1992?

24         A.    No.                         **A8**

25         Q.    What does this letter appear to be?

Page 26

1    Pension and Retirement Plan."  And it's dated

2    July 1998.  I would say it's about roughly 30

3    pages.

4         A.   Yeah.  I've seen this before.

5         Q.   You have seen this before?

6         A.   Uh-huh.

7         Q.   Do you recognize this as the summary

8    plan description of the DuPont pension plan?

9         A.   Let's see here.

10              No.  I'm not saying that's not what

11   it is; but right now looking at it, I don't.

12        Q.   If you look on the second page of that

13   document at the very top, the title says "Pension

14   and Retirement Plan -- Summary"; is that correct?

15        A.   Yes.

16        Q.   Okay.  Did you receive this document

17   during the course of your employment with DuPont?

18        A.   I dug up this document myself after all

19   this stuff started happening.

20        Q.   And by that, you mean after 2004, 2005?

21        A.   Yeah.

22        Q.   Okay.

23        A.   I mean yes.

24        Q.   So prior to that, you had never seen

25   this document?

**A9**

Page 27

1       A.   I might have seen it floating around

2   because I, you know, I try to keep things on file

3   that are distributed by the company.  But, you

4   know, my folder with, with the benefits

5   information has been -- I seem to recall looking

6   for this document myself and finding it once I

7   started exploring why in the heck they weren't

8   giving me the pension.  That's when I became

9   familiar with this document.

10      Q.   Where did you find it when you went

11   looking?

12      A.   I just went on the website and dug

13   around for all information I could find on the CTP

14   plan, the, what the actual, you know, to see what

15   I had in my file versus what -- you know, it

16   became incumbent upon myself to start researching

17   this stuff since I had just been denied.

18      Q.   Okay.  Do you recall ever having been

19   given this document during the course of your

20   employment with DuPont?                **A10**

21      A.   I don't recall being, someone in a

22   meeting or whatever saying, By the way, here's

23   your pension and retirement plan document for your

24   review, your file, for -- you know...

25      Q.   Could you have received it and you just

Page 28

1    don't remember, or you didn't receive it?

2         A.   Of course, I could have received --

3    anything could have happened.

4         Q.   Okay.  I'm just trying to clarify

5    whether you don't remember if you received it or

6    you don't think you received it, which is the more

7    correct answer.

8         A.   I don't recall receiving this document

9    per se.

10        Q.   Okay.

11        A.   I may have seen it floating around in

12   people's offices.  I may have seen it on the

13   website.  I may have -- you know, at one point I

14   think I mailed away for documents about medical

15   and this and that and, and may have gotten a whole

16   set of, you know, it's hard -- I don't recall.

17        Q.   Okay.

18        A.   I don't recall on that.

19        Q.   Okay.  On this second page of this

20   document, it seems to be indicating four different

21   kinds of pensions that are potentially available

22   to full-time employees at DuPont.  Are you

23   familiar with these four different kinds of

24   pensions?                                        **A11**

25                   MR. STULL:  Could you clarify that?

Mike V. Mata                                                March 16, 2006
                        Wilmington, DE

                                                              Page 30

1    service, you may be eligible for this pension; is

2    that correct?  Is that what the document

3    indicates?

4          A.   Yes.

5          Q.   In fact, Mr. Mata, are you anticipating

6    receiving a normal retirement pension from DuPont

7    upon the age of 65?

8          A.   My understanding is yes.

9          Q.   Okay.  Mr. Mata, have you, during the

10   course of your adult life, done any retirement

11   planning or planning for your retirement?

12         A.   Well, give me a moment on that.

13              For a short while, yes.

14         Q.   Can you explain that answer?  What did

15   you do?

16         A.   Well, in 1997 I was involved in a legal

17   dispute that has nothing to do with this one.  But

18   all of my money was cleaned out.  And my -- any

19   hopes of thinking about things like that kind of

20   flew away over the next six years.  So...

21         Q.   What was the nature of this legal

22   dispute?                        **A12**

23         A.   It was a, it was a interspousal tort.

24   My sister had been battered by her spouse.  And

25   there was a lawsuit that I was involved with for,

Mike V. Mata                                                                    March 16, 2006

Wilmington, DE

Page 31

1    I think, about six years there.  And as my money,

2    all was lost, then I thought -- well, I guess you

3    could say I thought about how I was not going to

4    ever be able to have any kind of -- you know, my

5    SIP plan would be gone.

6         Q.   Okay.

7         A.   And I would have no money in the bank

8    and would end up indigent, bankrupt, and so on.

9         Q.   When you say you lost your money, what

10   are you talking about, your savings account?

11        A.   Every penny that I ever worked or

12   earned for was lost in that lawsuit.

13        Q.   Prior to that you had been saving

14   regularly?

15        A.   Up until 1997 I was saving somewhat --

16   some money, some years.

17        Q.   Okay.  So after 1997 you no longer had

18   a savings account, to speak of?

19        A.   No.  I don't -- I've never had a

20   savings account in my life for more than, for more

21   than probably six months at a time.

22        Q.   Okay.  Did you ever speak with a

23   financial adviser about retirement planning?

24        A.   No.                              **A13**

25        Q.   Did you ever open an IRA or "individual

Page 32

1    retirement account"?

2          A.    No.

3          Q.    Did you ever have any CDs or any other

4    type of savings plans?

5          A.    I had small -- I had 10,000, $10,000 in

6    the bank once, I think, in 1991.

7          Q.    And did you, in fact, ever file

8    bankruptcy, Mr. Mata?

9          A.    Yes, I did.

10         Q.    When was that, sir?

11         A.    That was in -- let's see.  The case was

12   just closed out less than a year ago.  So it was a

13   five-year deal, whatever that would have come out

14   to.  I think I filed in, approximately the year

15   2000, I think, is when I filed bankruptcy.

16         Q.    Was that a Chapter 7 bankruptcy?

17         A.    Yes.

18         Q.    Did DuPont offer a 401(k) plan or other

19   retirement savings plan?

20         A.    Yeah.  They had, they have Merrill

21   Lynch savings investment plan.                **A14**

22         Q.    Did you participate in that?

23         A.    Very little, but on and off, yes.

24         Q.    How would you participate?  Would it be

25   regular deposits out of your paycheck or periodic

Page 33

1    deposits?

2         A.    I would put in as much as I could

3    afford for their matching money until such time

4    that I had to stop from financial pressures.

5         Q.    So is this every paycheck you would

6    make a contribution for a period of time?

7         A.    Yeah.  Then I would get financially,

8    you know, pressed and I would have to terminate

9    it, use the money elsewhere.

10        Q.    Okay.  DuPont matched some of these

11   funds, you indicated?

12        A.    That I would have to look up for you.

13        Q.    Okay.

14        A.    If, if that's their program and I was

15   in there for a long-enough period of time,

16   probably, yes.  They probably matched some of my

17   money in there.

18        Q.    But not that you recall?

19        A.    Oh, no.  Wait.  I take that back.  They

20   matched it.  Whatever, you know, the rules were,

21   they held their deal.  They hadn't...

22                    Whenever I was contributing, they,

23   they were doing their part to...          **A15**

24        Q.    Okay.  When you stopped contributing,

25   did you then take your money out of this account

Page 34

1    or did it remain in the account?

2         A.    I kept taking it out as necessary.

3         Q.    Okay.  At the time of your termination

4    from DuPont, did you have any money --

5         A.    Yes.

6         Q.    -- in that savings plan?

7         A.    Yes.

8         Q.    You did?

9         A.    Yes.

10        Q.    And approximately how much was that?

11        A.    I think I got as high as a whopping

12   46,000.

13        Q.    Okay.

14        A.    It may have been even a little bit more

15   but...

16        Q.    And when you were terminated from

17   DuPont, did you roll that money into another plan

18   or did you cash it out?  How did you treat those

19   funds?

20        A.    I left it right there.

21        Q.    So it's still there now?

22        A.    Well, a little bit.

23        Q.    You've withdrawn some of the funds?

24        A.    I've withdrawn almost every penny of

25   it.

**A16**

Page 35

```
 1        Q.   But that's post termination?

 2        A.   Yeah.  It's just been an ongoing

 3   process for my entire employment with DuPont.

 4   Whatever's been in there, I've always been

 5   grabbing for it during emergencies.

 6        Q.   Okay.

 7        A.   And eventually -- well, that's not

 8   neither here nor -- go ahead.

 9        Q.   Okay.  I've alluded to your

10   termination.  When were you terminated from

11   DuPont?

12        A.   My official termination date was

13   July 1st of 2004.

14        Q.   Of '04.  And why were you terminated

15   from DuPont?

16        A.   They gave lack of work as the reason.

17        Q.   Okay.

18        A.   I have other ideas, but that's what

19   they said.

20        Q.   Okay.  Was there a reduction in force

21   going on at the time?  Were there other employees

22   terminated at the same time that you were?

23        A.   Yeah.  Chad Holliday had handed down a

24   global directive to streamline the business under

25   the new DuPont, and our business for the first
```

**A17**

Mike V. Mata                                                      March 16, 2006

Wilmington, DE

Page 36

```
1    time got hit.

2                    (Exhibit 4 was marked for

3    identification.)

4    BY MS. DiLUZIO:

5         Q.   Okay.  Mr. Mata, the court reporter's

6    just handed you what's been marked as Defendant's

7    Exhibit 4.  It's a one-page document.  And the

8    title at the top is "Expression of Interest to be

9    Terminated for Lack of Work."

10                   Do you recognize this document?

11        A.   Yes.

12        Q.   Okay.  And can you tell me what it is?

13        A.   My understanding of this document was

14   that I was going to be the one that got the ax

15   because -- well, that's neither here nor there

16   either -- that I was going to be the one that got

17   the ax, most likely, and that rather than lose the

18   chance of getting the CTP, that it would increase

19   my chance -- a formality just to make sure that

20   nothing went wrong with me getting the CTP.

21        Q.   And what's the CTP?

22        A.   Career transition program.

23        Q.   Is that essentially a severance

24   benefit?

25        A.   Yes.
```

**A18**

Page 37

1       Q.   So you submitted this expression of

2  interest to DuPont indicating that if they were

3  doing reductions in force, you would like to be

4  considered to be one of the people separated; is

5  that correct?

6       A.   Could you rephrase that again?  I'm

7  sorry.

8       Q.   Sure.  Paragraph 1 of this expression

9  of interest form says, I wish to be considered for

10 involuntary termination of my employment with

11 DuPont?

12      A.   Uh-huh.

13      Q.   So was this document essentially your

14 indication to DuPont that you were willing to put

15 your name on the list of people that were to be

16 separated as part of the reduction in force?

17      A.   The purpose of the document was to keep

18 me from losing -- it was a prudent measure

19 recommended by my boss that, just not to take the

20 chance that you'd lose it.

**A19**

21      Q.   Okay.

22      A.   Everyone anticipated I was going to be

23 let go.  And this just kind of was a clean way of,

24 of making sure that nothing went wrong when the

25 time came to -- they were going to give, give it

Page 40

1    terms, it would be approximately 60,000; is that

2    correct?

3                    THE WITNESS:  Yeah.  I think my --

4    60 to 65, I think, is what the last --

5    BY MS. DiLUZIO:

6        Q.   Okay.

7        A.   -- tax return showed, I think.

8                    MR. STULL:  For annual income?

9                    THE WITNESS:  Yes.

10   BY MS. DiLUZIO:

11       Q.   Okay.  Mr. Mata, you've alluded to the

12   fact that you did apply for a pension benefit from

13   DuPont; is that correct?

14       A.   Yes.

15       Q.   Can you explain to me how that came

16   about?

17       A.   Yeah.  It was fairly straightforward.

18   All year, I guess, as D-Day started coming closer,

19   as everyone sensed in the office with the

20   rumblings around with the new DuPont and so on --

21   could you say that again?

22       Q.   Sure.  How did it come about that you

23   applied for a pension benefit?            **A20**

24       A.   Oh, okay.  Okay.  I'm sorry.

25                    Some friends of mine in the office

Page 41

1    told me that I could retire.  They are not in a

2    position of authority.  But I was talking to

3    somebody just like I am you now, chitchatting

4    about all the stuff that's going on at DuPont.

5                    How old are you, Michael?

6                    I'm 50.

7                    Been here 15 years.  Yeah.  I just

8    got my service award.  15 years, yeah.

9                    And my one friend told me, You just

10   snuck right in under the wire for retirement.  You

11   really lucked out.  If this had come a couple

12   months earlier...

13                   So that's the first inkling I had

14   of it.  Then I went to a gentleman by the name of

15   Fran McManus, the marketing manager there.  And I

16   walked in his office and told him what was going

17   on, and we were chatting about all the things that

18   were happening.

19                   And I said, Fran, it's good news.

20   Alan says I just made it under the wire so I'm

21   going to be able to, it looks like I'm going to be

22   able to retire.

23                   So Fran said, Well, that's great,

24   Mike.  That's good news.                    **A21**

25                   So I thought about it some more.

Page 42

1    And then I went to see Patty Drysdale about

2    matters in general, of getting me checked out and

3    stuff, and the company.  And the way I really

4    found out was Patty Drysdale was typing on her, on

5    the computer, just entering information about me

6    to expedite the processes that we were doing.  It

7    was a lot of different things.  And she was typing

8    like this.  And she turned around and she goes,

9    Mike, are you 50?

10                   I said, Yeah.

11                   She said, Mike, I think you can

12    retire.

13                   I just went, Great.  I was like,

14    Great.

15                   She goes, Mike, I want you to look

16    into it, you know, because she felt bad because

17    she was a friend of mine that had known the

18    hardships I had gone through with my, losing all

19    my life savings and everything.  And she knew how

20    hard it was going to be.  So she was happy for me.

21                   And after she told me that, then I,

22    I think the very next day or within a day or two

23    at most later, I just got right on it and called

24    in to retirement.                        **A22**

25         Q.   Okay.  Let me back up for just a

Page 43

1    minute.  Who was this friend who said, Hey, Mike,

2    I think you can retire?

3        A.   It was, his name is Alan McConachie.

4    He's the, he's a marketing guy there at Barley

5    Mill Plaza.

6        Q.   As far as you know, he's still employed

7    by DuPont?

8        A.   Oh, yeah, he is -- yeah, as far as I

9    know, he is, yeah.

10        Q.   And when, roughly, did this

11    conversation take place?

12        A.   Let's see.  Oh, it would have been a

13    week or so before Patty handed me this.  Well,

14    this has -- yeah.  I have my own receipt mark on

15    this, and it's marked June 8th, '04.  So it would

16    have been right at the end of May, somewhere in

17    there, the first week in June, maybe.  It wasn't

18    too long after, after that that I went in to...

19        Q.   And that was late May, early June 2004?

20        A.   Yes.

21        Q.   Okay.

**A23**

22        A.   As far as I can remember, that's,

23    that's about as close as I can nail that down.

24        Q.   Okay.  Prior to that conversation with

25    Alan, did you know anything about the DuPont

Mike V Mata                                                    March 16, 2006
                            Wilmington, DE

                                                              Page 45

1    corporation like this for 15 years.

2                    But that was -- I got the

3    impression that he, being a regional manager, was

4    going through the stuff with all the meetings with

5    all the honchos around Wilmington and our honchos

6    back there, you know, just making a remark about

7    it.  So that always stuck in my mind that, you

8    know, you have 15 years.

9         Q.   But prior to this conversation with

10   Alan McConachie, you didn't inquire about

11   receiving a pension, an early retirement pension

12   from DuPont?

13        A.   No.  There was no reason to.

14        Q.   Okay.

15        A.   Things were going along wonderful.  I

16   mean, not...

17        Q.   Now, the expression of interest that we

18   marked as Exhibit 4 was dated April 21.  So you

19   knew as early as April 21 that you were likely to

20   be terminated in connection with the reduction in

21   force; right?                          **A24**

22        A.   Let's see.  April 21.  Yeah.  Things

23   were being discussed then.  And, yeah, there was,

24   Ray Anderson and Ed Donnelly and those guys were,

25   were telling us there were some big changes coming

Page 46

1    in the company.

2         Q.   Okay.  And who was Ray Anderson and --

3         A.   Ray Anderson is the global director

4    for -- or he is the North American director for

5    the DuPont Performance Coatings.

6         Q.   And how about Mr. Donnelly?

7         A.   Mr. Donnelly is, works for Chad in that

8    group, Chad Holliday.  He's in charge of, I think,

9    I don't know exactly what they call it.  I think

10   it's finishes.

11        Q.   Okay.  So you knew as early as April

12   that you were likely to be terminated in

13   connection with this reduction in force.  When's

14   the first time that you inquired about receiving

15   an early retirement pension benefit?

16        A.   As soon as I found out that I might be

17   able to get it.

18        Q.   And when was that?

19        A.   When -- the McConachie comment.

20        Q.   Okay.  So you said that you then spoke

21   with Fran McManus, who was a marketing manager.

22   And then you went to see Patty Drysdale.  Who was

23   she?                               **A25**

24        A.   She was the administrative assistant to

25   a gentleman by the name of Lendle Bean, who was

Page 48

1    early retirement pension; is that right?

2          A.    She said, Mike, I think you can retire.

3          Q.    Okay.  And then what happened?

4          A.    Just let me check into this.

5          Q.    Okay.

6          A.    And that meeting ended.  And she

7    started -- and the next day, I think it was, I

8    went back and -- that...

9          Q.    So the next day you went back to see

10   Patty to find out what she had determined about

11   your pension?

12         A.    Yeah.  I think she left a phone message

13   for me saying that she was going to dig into the,

14   quote, unquote, Nason file.

15         Q.    Okay.

16         A.    And, and I think she was doing it to,

17   just to verify it is what I thought.

18         Q.    Okay.  So then that next day is when --

19         A.    Wait.  Let me correct myself.

20         Q.    Sure.                          **A26**

21         A.    Let me backtrack for a second, make

22   sure this is accurate.  Patty told me she thought

23   I could retire, and she said she would look into

24   it.  Then she told me either directly or

25   indirectly or implied to me that it's time to go

Page 49

1    ahead and do it.

2              And that is what I did.  I called

3    the department that handled pension and retirement

4    and told them I would like to apply for my

5    retirement based on the CTP program.

6         Q.   Okay.

7         A.   They told me, No, I don't have enough

8    time.  And I challenged that.  And they said, No,

9    again.

10             When I went back and told Patty

11   that and wrote to my manager about it and copied

12   his manager, then I went back to Patty and said,

13   Patty, they're not going to let me do it.  What's

14   going on?

15             She goes, I don't know -- something

16   to this effect:  I don't know, Mike.  Hang on a

17   sec.  Let me get back to you later.

18             Then she produced these, the two

19   documents here:  First year of service benefits

20   letter and the employment sign-up benefit

21   selection that mentions the exceptions in pension

22   back in 1991 and '92 --

**A27**

23        Q.   Okay.

24        A.   -- your Exhibits 1 and 2.

25        Q.   Okay.  So how long between that first

Mike V. Mata                                                    March 16, 2006

Wilmington, DE

Page 50

```
 1     conversation with Patty and when you made the

 2     phone call to -- was it to DuPont Connection?

 3          A.   No.   It was to a business.   It was a, I

 4     can't tell you the exact name of the business

 5     unit.   It was -- it's down on the list somewhere.

 6     I think it was a different business unit that had

 7     specific responsibility for, for when you apply

 8     for your retirement.   That's what my understanding

 9     was.

10          Q.   Okay.   How long between that first

11     conversation with Patty and when you made that

12     phone call?

13          A.   I would say less, less than a week,

14     probably even the next day or day after.

15          Q.   And when you made the phone call --

16          A.   Wait a minute.   Wait, wait, wait, wait.

17     Wait, wait.   I made the phone call to the

18     benefits -- to the pension people first.   Didn't I

19     just say that?

20          Q.   Well, you said you had this first

21     conversation with Patty where she said, Hey, Mike,

22     I think you might be eligible for retirement.   And

23     then you made a phone call, made two phone calls,

24     in fact, and then came back to Patty.   And she

25     pulled these documents; is that not accurate?
```

**A28**

Page 53

1        Q.   And you were at this time in 2004 at

2    least 50 years old --

3        A.   Yeah.

4        Q.   -- correct?

5        A.   Yeah.

6        Q.   Did you request an official pension

7    calculation around at this time?

8        A.   I don't know about -- I don't know

9    about an official one.  But I believe I was

10   advised to, to request one.  And, yes, I guess the

11   answer would be.

12                    (Exhibit 5 was marked for

13   identification.)

14   BY MS. DiLUZIO

15       Q.   Mr. Mata, the court reporter's handing

16   you what's been marked as Exhibit 5.  It's a

17   three-page document.  And it says Pension Estimate

18   Package.

**A29**

19       A.   Yes.

20       Q.   Appears to be dated January 23, 2004.

21   Do you recognize this document?

22       A.   Yes.  There was a lot of these

23   documents, so they're really -- I do recognize it.

24   There's a lot of them that are very similar.

25       Q.   Was this document something that you

Page 54

1    received in or about January of 2004?

2        A.   No.  That's not an accurate date there

3    on the top.

4        Q.   Okay.  When do you believe you received

5    this?

6        A.   I received -- I believe I received

7    this -- let's see.  I don't have my copy of it.

8    Or maybe I...

9              MR. STULL:  May I request

10   clarification?  This is a three-page document?

11             MS. DiLUZIO:  Yes.

12             MR. STULL:  And that is your

13   Exhibit 5, three-page --

14             MS. DiLUZIO:  Yes.

15             MR. STULL:  -- document?  And this

16   was submitted in connection with the CTP program?

17   Or this was provided --

18             MS. DiLUZIO:  I'm trying to find

19   that out.

20             MR. STULL:  Because they don't have

21   page numbers that would indicate -- and they're

22   different dates.  This is January 23rd,

23   July 4th -- I'm sorry.  Two January 23rd's.

24   Separation date, July 4th -- okay.          **A30**

25             THE WITNESS:  Yeah.  That

Page 55

1    January 23rd, 2004 date is not correct.  And I

2    have an explanation for that.  I believe it was a

3    template that was created, you know, on or around

4    that date and that they would -- when people would

5    call in for the request, that they would use the

6    template and plug in the current information.

7    That's my understanding.

8    BY MS. DiLUZIO:

9        Q.    Okay.

10       A.    Because we weren't talking about this

11   January 23rd of 2004.  It wasn't enough rumbling

12   around about the downsizing then for people to be

13   jumping for their pension.

14       Q.    Okay.  Is this a document that you've

15   requested, or is this something that DuPont

16   provided in anticipation of your termination and

17   in connection with the CTP program?

18       A.    I seem to recall requesting either this

19   document or a document pretty close to it.  Upon

20   recommendation of my boss and just reading all the

21   paperwork they were handing us, I think some -- I

22   can't tell you exactly who -- I think someone said

23   that you should gather this kind of information --

24       Q.    Okay.

25       A.    -- you know, so that you know where you

**A31**

Page 56

1    stand.  None of us know what's going to happen

2    with this new DuPont.

3         Q.   Okay.  So when do you believe you

4    received this document?  You said not in

5    January 2004.  So when do you think you received

6    it?

7         A.   I have my copy stamped.  But,

8    unfortunately, it's not with me.  So -- but I

9    could take a note of that and get that answer back

10   to you, unless you want me to take a reasonable

11   guess.

12        Q.   If you have a reasonable guess.  I

13   mean, I don't want you to completely guess.

14        A.   I'm thinking, I'm thinking, I'm

15   thinking -- okay.  This document I, I got right

16   around the same time as the, all the career

17   information -- career transition program packets

18   were being passed out.                **A32**

19              I remember going onto the Internet

20   and just grabbing all the information that I, that

21   I could find that would relate to this, this

22   craziness that was happening at headquarters.

23              So I don't mean to be ambiguous

24   here, but I guess I am being.  Maybe you could --

25        Q.   Well, are we talking around the May to

Mike V. Mata                                                          March 16, 2006
Wilmington, DE

Page 57

1    June 2004 time period that you were --

2          A.   Yeah; that would be reasonable to say,

3    somewhere in there.

4          Q.   Okay.  This document, on page 2,

5    appears to indicate that you will be eligible to

6    begin receiving a pension on August 1st, 2011.

7               Do you see that?

8          A.   I'm familiar with that comment, and I'm

9    sure I see it right here.  Let's see.  We're on

10   page 2 of the pension estimate package?

11         Q.   Yes.

12         A.   I know what you're talking about.  I've

13   seen that number even if I don't see it right this

14   second.

15         Q.   If you look around the heading

16   Information From Our Records...?

17              MR. STULL:  Where?

18   BY MS. DiLUZIO:

19         Q.   Do you see that section?  On page 2

20   there's a heading Information From Our Records.

21              MR. STULL:  Sorry.

22   BY MS. DiLUZIO:

23         Q.   And then it says in the right-hand

24   column Benefit Commencement Date.  It says

25   8/1/2011.                          **A33**

Mike V. Mata                                                    March 16, 2006
                          Wilmington, DE

Page 59

1        Q.   Okay.  And 2011 is five years from now?

2        A.   I suppose, yes.

3        Q.   Because it's 2006; right?

4        A.   Yes.

5        Q.   So will you be 60 on August 1st, 2011?

6    Does that sound right?

7        A.   59.

8        Q.   On August 1st, 2011?

9        A.   Oh.  Yes, I guess I'll be 60.

10       Q.   Okay.

11       A.   Sorry about that.

12       Q.   That's okay.  So according to this

13   document, you will be eligible to begin receiving

14   pension benefits from DuPont once you reach the

15   age of 60; isn't that right?

16       A.   That was my impression, 60 or 61.  I

17   haven't been quite sure on that.

18       Q.   Okay.

19       A.   But it would seem so.

20       Q.   Okay.  Do you see also in this document

21   in that same column it says Earliest Unreduced

22   BCD?  And the BCD is the benefit commencement

23   date.                                    **A34**

24       A.   Yes.

25       Q.   And then it says 8/1/2016?

Mike V. Mata

March 16, 2006

Wilmington, DE

Page 60

1      A.   Yes.

2      Q.   Is it fair to say that you'll be 65

3  years old on August 1st, 2016?

4      A.   Yes.

5      Q.   So this document seems to indicate that

6  you will receive an unreduced pension benefit if

7  you wait until 2016 to begin receiving pension

8  benefits; is that correct?

9      A.   That sounds correct to me, yes.

10     Q.   And if you want to look back to our

11  Exhibit 3 here, which is the pension and

12  retirement plan summary, plan description --

13     A.   Uh-huh.

14     Q.   -- on that page No. 1, the normal

15  retirement pension seems to indicate that you're

16  eligible for normal retirement pension if you were

17  at least age 65 with 15 years of service; is that

18  correct?                      **A35**

19     A.   I see that.

20     Q.   So that seems to correspond with this

21  document here, with Exhibit 5?

22          MR. STULL:  What you're asking, if

23  I can ask a clarification here, is that these

24  documents have an assumption that the service that

25  is used to credit benefit entitlement is correct.

Page 61

1              MS. DiLUZIO:  Well, with all due

2      respect, John, I think what I'm asking Mr. Mata

3      is, upon the age of 60 or 65, he will receive a

4      pension benefit from DuPont under the DuPont plan

5      in accordance with normal retirement provisions.

6      BY MS. DiLUZIO:

7          Q.   Is that correct?

8          A.   It's my understanding that, yeah, that

9      I'm not going to get cut out altogether.  But

10     that's a good question.  Because I've been trying

11     to research that, thinking, God, am I going to get

12     anything at all ever?

13         Q.   But this Exhibit 5 seems to indicate

14     that as early as 2011 --

15         A.   Yes.

16         Q.   -- you can start receiving pension

17     benefits?

18         A.   Yes, it does.

19         Q.   And you have no reason to believe that

20     you're not going to get benefits at that point, do

21     you?

22         A.   I'm tempted about everything.  But

23     according to -- Lendle Bean told me that you're

24     not going to get ripped totally for your

25     retirement; you just can't have it now.  That's my

**A36**

Mike V. Mata                                                    March 16, 2006

Wilmington, DE

Page 66

```
 1    BY MS. DiLUZIO:

 2         Q.   I'm just interested in what documents

 3    you have, Mr. Mata.

 4         A.   Okay.

 5         Q.   Okay?

 6         A.   All right.

 7         Q.   Now, Mr. Mata, in this lawsuit you've

 8    also identified several people who you indicate

 9    you believe received different treatment than you

10    under the DuPont pension plan --

11         A.   Yes.

12         Q.   -- is that fair to say?

13         A.   Yes.

14         Q.   And I just want to go through these

15    people if we could.

16         A.   Okay.

17         Q.   The first individual named is Larry

18    Sayre?

19         A.   Yes.

20         Q.   And who is that?  Who is Mr. Sayre?

21         A.   Larry Sayre was a guy that was one of

22    the original acquisition executives that was in

23    charge of things like coordinating of factory

24    inventories, coordinating distribution channels

25    between the centers, and just product
```

**A37**

Page 67

1    inventory-related and production in relation to

2    warehousing-type stuff.

3          Q.   So he was originally a Nason employee?

4          A.   Yes, he was an employee of Nason.

5          Q.   And then became a DuPont employee in

6    connection with the acquisition?

7          A.   Yeah.   That's correct.

8          Q.   Okay.   And when did he leave DuPont; do

9    you know?

10         A.   That's a tough one.   I believe Larry

11   Sayre, I can only give an educated guess.   I'm

12   thinking Larry Sayre left around 1996.   I don't

13   remember seeing him around the company after that.

14         Q.   Okay.   And did he leave in connection

15   with a reduction in force?  Did he retire?  Did he

16   move on to another employer?

17         A.   He retired.

18         Q.   He retired?

19         A.   He retired; yep.

20         Q.   And do you know how old he was at this

21   point?

22         A.   I can give an educated guess that

23   Mr. Sayre had to be probably about 65.

24         Q.   Okay.                      **A38**

25         A.   I'm thinking he was at normal

Page 68

1    retirement age, and that's why he retired.

2         Q.   Okay.  And you believe he received a

3    pension benefit from DuPont upon his retirement?

4         A.   Yes.

5         Q.   Okay.  And what do you base that

6    knowledge on?

7         A.   On someone that I trust and has proven

8    to be an accurate source of friendship and

9    information in company matters, Alan McConachie --

10        Q.   Okay.

11        A.   -- mentioned it to me; not just to me.

12   I think there was a few of us that were just,

13   again, you know, office bantering about all the

14   stuff, upheavals, and the subject came up.

15   Because people were asking, What about pensions?

16   What's going to happen with pensions?  Everyone

17   was all up in the air, you know, calling in and

18   worrying about it.  And so that subject was, you

19   know, came up in the office bantering.

20             And Alan said, not verbatim, but

21   something to the effect of Larry Sayre retired and

22   they denied him his pension.

23        Q.   They denied him his pension?

24        A.   This is a comment that Alan McConachie

25   made.                                        **A39**

Mike V. Mata                                                    March 16, 2006
                              Wilmington, DE

Page 69

```
 1        Q.   Okay.

 2        A.   Larry Sayre put in for pension and was

 3   denied.  And he paused, if I remember, and then

 4   said something to the effect of, But you know

 5   what?  He fought it tooth and nail, and they gave

 6   it to him.

 7        Q.   As far as you know, Mr. Sayre did not

 8   apply for and/or receive early retirement pension

 9   benefits; is that right?

10        A.   Well, I don't think so.

11        Q.   Okay.

12        A.   Because he was already old enough.

13        Q.   The next individual that you've

14   identified in your lawsuit is William McConachie.

15   Now, is that Alan McConachie, or is this a

16   different individual?

17        A.   It's his father.

18        Q.   It's his father.  Okay.  And was

19   William McConachie a Nason employee?

20        A.   Yes.

21        Q.   And then became a DuPont employee?

22        A.   Yes.

23        Q.   And do you know when he left the

24   company, when he left DuPont?

25        A.   I'm going to say 1996, and it could be
```

**A40**

Mike V. Mata                                                    March 16, 2006
                            Wilmington, DE

                                                                   Page 70

1    early 1996 or maybe even into 1997.  But I

2    remember his going-away party at the office.  And

3    I got there in '94, and a couple years later he

4    was gone.

5         Q.   Okay.  And, again, he retired?

6         A.   He retired.

7         Q.   And do you know how old he was,

8    roughly?

9         A.   Mr. McConachie, I'm guessing, would

10   have been 65 or 66, because I know he wanted out.

11   He never wanted to go to begin with.  So as soon

12   as he could get out, he would have gotten out.  I

13   believe he did get out.

14             MR. STULL:  Can I ask one

15   clarifying?  You're talking William McConachie

16   retired or Alan?

17             THE WITNESS:  William.

18             MS. DiLUZIO:  We're talking about

19   William.

20   BY MS. DiLUZIO:                    **A41**

21        Q.   And do you have any understanding as to

22   whether or not he received pension benefits under

23   the DuPont plan?

24        A.   I don't have any direct proof of that.

25        Q.   Okay.  Do you believe he received

Page 71

1    pension --

2         A.    I believe he received it, yes.

3         Q.    Again, that would have been the normal

4    retirement benefits, not an early retirement

5    benefit; right?

6         A.    Yes.

7         Q.    Okay.  How about Robert Thompson; was

8    he a Nason employee?

9         A.    Yeah.  He was a sales guy out in

10   Kansas.

11        Q.    And did he become a DuPont employee

12   with the acquisition?

13        A.    Let's see.  I could be mistaken, but I

14   believe he came on after the acquisition.

15        Q.    Okay.  And is he still with DuPont as

16   far as you're aware or --

17        A.    No.

18        Q.    -- is he retired?

19        A.    He retired.                    **A42**

20        Q.    And do you know about when?

21        A.    (No response.)

22        Q.    I don't want you to completely guess.

23   If you don't know, just let me know that you don't

24   know.

25        A.    Okay.  No, I can't give you exact dates

Page 72

1      on these guys.  But they were all...

2                    MR. STULL:  Late '90s.

3                    THE WITNESS:  Yeah.

4      BY MS. DiLUZIO:

5           Q.   Was Mr. Thompson 65 at the time he

6      retired; do you know?

7           A.   My belief is that he was.  I don't have

8      proof of that, but I believe he was.

9           Q.   Okay.

10          A.   Because I...

11          Q.   And do you believe or do you know

12     whether or not he received a pension benefit from

13     DuPont?

14          A.   I don't know.

15          Q.   Okay.  How about Robert Napote or

16     Napote?  I'm not sure how to pronounce that.

17          A.   Yeah.  Robert Napote.  He retired.  And

18     nobody knows what he got.

19          Q.   Okay.  He retired at age 65 from

20     DuPont?

21          A.   My belief is he did.

22          Q.   And he had also been a former Nason

23     employee?

24          A.   I don't know for sure.            **A43**

25          Q.   Okay.

Mike V Mata                                                          March 16, 2006
Wilmington, DE

Page 73

```
 1        A.    He was a Nason employee.  I just don't
 2   know if he was a Nason employee during the time
 3   when it was run as a separate business under the
 4   DuPont umbrella or if it was before DuPont.
 5        Q.    Okay.  How about John Vance; is that a
 6   name you're familiar with?
 7        A.    Yeah.
 8        Q.    Was he a Nason employee that came to
 9   DuPont?
10        A.    Yes.  That I know.
11        Q.    And did he retire from DuPont?
12        A.    Yes.
13        Q.    At age 65?
14        A.    I don't know, but I think yes.
15        Q.    Okay.  How about Frank Smith?
16        A.    Frank Smith was railroaded out, is my
17   understanding.
18              MR. STULL:  Clarify that statement.
19              THE WITNESS:  DuPont didn't like
20   him because he didn't do things -- he was a guy
21   from Texas that kind of talked with a drawl.  He
22   just didn't fit in with the culture at DuPont, and
23   so they wanted him out.  And I think, I feel safe
24   in saying they either fired him or pushed him
25   pretty firmly in that direction to get out.
```

**A44**

Mike V. Mata                                                    March 16, 2006
                            Wilmington, DE

Page 74

1    BY MS. DiLUZIO:

2         Q.   So Frank Smith, as far as you're aware,

3    did not retire from DuPont but simply terminated

4    from DuPont otherwise?

5         A.   Yes, that's correct.  That's my

6    understanding.

7         Q.   Okay.  Had he been a former Nason

8    employee?

9         A.   Yeah.  He was our national sales

10   manager.

11        Q.   Okay.  And, finally, how about Wayne

12   Neet?

13        A.   Wayne Neet was another one of those

14   guys that just, they're all hitting the retirement

15   age and they retired.

16        Q.   Also a former Nason employee that

17   became a DuPont employee?

18        A.   Yes.

19        Q.   Also, you believe, retired at the age

20   65?

21        A.   Yes.

22        Q.   Do you have any information, Mr. Mata,

23   that any of the individuals we've justed talked

24   about received early retirement benefits under the

25   DuPont pension plan?                **A45**

Page 75

1        A.    Let's see.  I don't think, I don't

2    think so.

3        Q.    Okay.  And do you have any information

4    for any of these individuals as to how their

5    service with DuPont -- or, rather, with Nason was

6    treated for purposes of their pension calculation?

7    Let's me ask that question again since I misspoke

8    in the beginning.

9              Do you have any information or

10   belief as to any of these individuals we've just

11   talked about as to how their Nason service was

12   treated for purposes of calculation of their

13   pension benefit under the DuPont plan?

14       A.    No.  I, I take that last question to

15   mean do I have any firsthand knowledge that

16   something like that happened.

17       Q.    Yeah.  Do you have any knowledge,

18   firsthand or secondhand, as to how their Nason

19   service was treated, whether it was included

20   within --

21       A.    No.  Those, those questions --

22       Q.    -- their years of service?

23       A.    -- are still, are still to be answered.

24       Q.    Okay.  So you don't know?

25       A.    No, I don't.

**A46**



*Pension Estimate (aka Tab 2,3) NO BATES NOS,*

DuPont Connection
P.O. Box 436
Little Falls, NJ 07424-0436
1-800-775-5955

22/9993/2252
MIKE V MATA                      72820        Date Produced:          January 23, 2004
1819 GILPIN AVE APT 2                         Social Security Number:  ---3022
WILMINGTON DE 19806

---

# PENSION ESTIMATE PACKAGE

This package was produced for you so that you would have an estimate of your pension benefit under the DuPont Pension and Retirement Plan in advance of your possible separation on 5/31/2004. The estimated Career Transition Program (CTP) benefit described in this package is available only if you are designated by DuPont management as eligible for CTP benefits.

This package contains:

- **Statement of Career Transition Program (CTP) Benefits** that shows the CTP benefit payable to you.
- **Pension Calculation Statement** which shows your estimated pension benefits under each of your available payment options.
- **Explanation of Pension Benefit Options** which explains each of the pension benefit payment options available to you.

References to any of these forms will be in **bold.**

A pension estimate is designed to help you determine your pension eligibility, estimated benefit and payment options as of a specific future separation date, and to help you decide when is the most appropriate time for you to retire or commence your benefits. You will need a Retirement/Benefit Commencement Package in order to commence your benefits. If you are selected by DuPont management as eligible for CTP, a Retirement/Benefit Commencement Package will be provided to you no more than 90 days before your separation date. This package will explain your benefit options and the steps you must take to begin your benefits. You must make your retirement/benefit commencement elections and submit the required paperwork before your separation date.

If you will not be eligible to commence benefits immediately after your separation date, and therefore have a vested future benefit you must request a Benefit Commencement Package no more than 90 days before your benefit commencement date in order to begin your vested benefit payments.

If you have foreign service with the Company and are eligible for a foreign benefit, your U.S. pension benefit will be reduced by the U.S. dollar equivalent of your foreign pension. For information about applying for foreign benefits, please contact the Social Security Administration at **1-800-772-1213.**

Review the information in this package carefully. It was created using information on file at DuPont Connection and information you provided when you called DuPont Connection to request this estimate. If you have any questions or if any of the information included in this package is incorrect, please call DuPont Connection at **1-800-775-5955** between the hours of 9 a.m. and 6 p.m., Eastern Time, Monday through Friday, to speak with an Employee Service Representative.

**A47**

*Avg*



## PENSION CALCULATION STATEMENT (ESTIMATE PACKAGE)

Date Produced: January 23, 2004

## PERSONAL INFORMATION

Name: MIKE V MATA  Date of Birth: July 4, 1951
Social Security Number: ***-**-3022

## GENERAL INFORMATION

This statement shows your estimated pension benefits under each of the payment options available to you. Monthly pension benefits are payable in addition to your Career Transition Program (CTP) benefit. Calculations are based on information you provided and data contained in our records. This estimate assumes continued service with the Company with no employment changes until your estimated separation date of 5/31/2004. Since you are still working, we have used your current rate of compensation to calculate your estimated pension earnings through your separation date.

Please note: The benefit amounts shown on the following pages are **estimates only** and may differ from your actual retirement benefits. See the **Explanation of Pension Benefit Options** included in this package for a brief description of each option. Also see the **Statement of Career Transition Program (CTP) Benefits** for your CTP monthly benefit amount.

## INFORMATION YOU PROVIDED WITH YOUR REQUEST ON 1/23/2004

Separation Date: 5/31/2004  Estimate Request Date: 1/23/2004
Compensation Projection Rate: 0%

## INFORMATION FROM OUR RECORDS

Original Hire Date: 5/8/1989  Benefit Commencement Date (BCD): 8/1/2011
Adjusted Service Date: 5/8/1989  Earliest BCD: 8/1/2011
Benefit Service at Separation: 12.58333  Earliest Unreduced BCD: 8/1/2016
Vesting Service at Separation: 14.20833  Normal Retirement Date: 7/4/2016
Age at Separation: 52.90833

**Average monthly compensation: High 36 consecutive months**

| Year | Total Compensation | # Of Months Used | Pension-Based Earnings Used |
|------|--------------------|------------------|------------------------------|
| 2001 | $56,564.00 | 8.0000 | $38,096.00 |
| 2002 | $58,916.00 | 12.0000 | $58,916.00 |
| 2003 | $56,364.00 | 12.0000 | $56,364.00 |
| 2004 | $23,625.00 | 4.0000 | $18,900.00 |
| Total | | 36.0000 | $172,276.00 |

Average Monthly Compensation: $4,785.44

## VESTED BENEFIT

# A48

The benefit formula used to calculate your pension is:

A = 1.2% of Average Monthly Compensation X Benefit Service

Based on the information listed above, your gross monthly pension payable at 8/1/2011 is: $541.95

Total Offset: $0.00

Monthly benefit payable at 8/1/2011: $542.00



## STATEMENT OF CAREER TRANSITION PROGRAM (CTP) BENEFITS

Name:                                         MIKE V MATA    Date Produced:                    January 23, 2004
Social Security Number:              ***-**-3022    Separation Date:                        May 31, 2004

In addition to your previously accrued pension benefit, you may receive benefits under the Career Transition Program (CTP). This form shows the amount of your benefits payable from CTP based on the separation date shown above. See below for general information about CTP.

## CTP GENERAL INFORMATION

The Career Transition Program (CTP) provides you with financial assistance in making the transition to employment outside DuPont. CTP provides you with one month's pay for every two years of service with a minimum of two months' pay and a maximum of 12 months' pay. CTP benefits for a partial two-year service period will be calculated proportionately with service rounded up to the next full month. CTP monthly payments are considered ordinary income and are subject to federal, state, local and Social Security taxes when they are paid. Payments may *not* be rolled over into another employer retirement plan or IRA. Your contributions for continued benefits (medical plan premiums, insurance premiums, etc.) will not be deducted from your CTP payments.

CTP payments are made to you each month until your full benefit is paid. If you die after your CTP benefit is payable, but before the full benefit for which you are eligible is paid, your beneficiary will receive the remaining payments. Your beneficiary designation automatically follows the order of "Standard Succession" as follows:
1. Lawful Spouse
2. Child or Children equally
3. Mother or Father equally
4. Sisters or Brothers equally
5. Estate

If you want to name a different beneficiary, call DuPont Connection at **1-800-775-5955** and ask for a Career Transition Program (CTP) Payment Beneficiary Designation Form.

## A49



# EXPLANATION OF PENSION BENEFIT OPTIONS (ESTIMATE PACKAGE)

Date Produced: January 23, 2004

**DuPont Pension and Retirement Plan**

The DuPont Pension and Retirement Plan provides specific payment options for your retirement benefits which are described below. Please read the following before making your pension elections. For more information, see your Summary Plan Description or call DuPont Connection at **1-800-775-5955**.

## VESTED BENEFIT

If you are single, this is the standard form of payment. This option provides you a monthly payment for your lifetime. Survivor benefits are not available under this option.

If you are married, you may select this option only if your spouse completes the **Spousal Waiver** section of the **Spouse Coverage Waiver/Single Certification Form**.

## VESTED BENEFIT WITH SPOUSE COVERAGE

If you are married, this is the standard form of payment.

This option provides you a monthly payment for your lifetime, reduced to reflect the cost of the **Spouse Coverage** benefit for your spouse. This benefit reduction is impacted by your age when your benefit begins and the difference between your age and your spouse's age.

Upon your death, your spouse will receive the **Spouse Coverage** benefit for his or her lifetime.

If you do not want your pension reduced to provide the additional **Spouse Coverage** benefit to your spouse, your spouse must complete the **Spousal Waiver** section of the **Spouse Coverage Waiver/Single Certification Form**. If your spouse completes the **Spousal Waiver** section, you may select the **Vested Benefit** option.

Only married participants are eligible for the **Vested Benefit with Spouse Coverage** option. The **Pension Calculation Statement** enclosed in this package does not illustrate monthly payment amounts payable under this option because you did not specify a spouse's date of birth at the time of your estimate request. If you would like to see this option illustrated, please call DuPont Connection and request another estimate.

**A50**

## YOUR CTP BENEFIT

Based on information on file at DuPont Connection, you are eligible for the following benefit under CTP:

| | |
|---|---|
| **CTP Monthly Compensation:** | **$5,008.33** |
| This amount includes: | |
|     Base Pay | $4,725.00 |
|     Variable Compensation | $283.33 |
| **CTP Service:** | **7.5417** |
| You are eligible to receive **7** monthly payments of: | **$5,008.33** |
|     - plus- | |
| A final monthly payment of: | $2,713.01 |
| **Estimated Total CTP Payment** | |
| **(CTP Monthly Compensation x CTP Service):** | **$37,771.32** |

Your CTP Service determines the number of months for which you may receive CTP benefits. Your CTP Service is based on your benefit service and is equal to half of your years of benefit service, but not less than two or more than 12. If you receive these CTP benefits, your monthly pension benefit is not affected. Please refer to the enclosed **Pension Calculation Statement** for more information about your monthly pension benefits.

**A51**

## MONTHLY BENEFIT PAYABLE TO YOU FOR YOUR LIFETIME

| **Pension Benefit Options** | Starting 8/1/2011 | ing |
|---|---|---|
| 1. Vested Benefit | $542.00 | |

The Investment Return Rate used in your pension calculation was 5%.

**A52**



Your DuPont
Benefit Resources

# Pension
# and
# Retirement
# Plan



July 1998

## A53

D000128

# Pension and Retirement Plan—Summary

*The DuPont Pension and Retirement Plan is designed to provide you with a lifetime retirement income based on your length of service with DuPont and the income you were earning in the years near retirement.*

*The plan provides four kinds of pensions for full-service employees:*

## NORMAL RETIREMENT PENSION

*You can retire with a normal retirement pension if you are at least age 65 with at least 15 years of service.*

## EARLY RETIREMENT PENSION

*You are eligible to retire with an early retirement pension as early as age 50 with 15 or more years of service.*

## OPTIONAL RETIREMENT PENSION

*If you are involuntarily terminated, you may be eligible to retire with an optional pension at age 50 with at least 15 years of service or as early as age 45 with 25 years of service if you are terminated for lack of work.*

## INCAPABILITY RETIREMENT PENSION

*You may qualify for an incapability pension if the Company determines you have become permanently incapable of performing your job and you have at least 15 years of service.*

*You or a beneficiary may also be entitled to a benefit from the plan:*

- *If you leave the Company, you may still be entitled to a plan benefit, provided you have at least five years of service. However, under certain circumstances, you may become vested before acquiring five years of service*

- *If you die before or after retirement, your spouse or other survivor(s) may be entitled to a benefit from the plan, provided you are vested in the plan*

*Details are in the following pages.*

**A54**

D000129

# Pension and Retirement Plan—Table of Contents

## Details of the Plan

WHO IS ELIGIBLE ........................................................................................................5

Normal Retirement Age ..........................................................................................5

WHEN YOU MAY RETIRE ...........................................................................................5

Normal Retirement ...............................................................................................5

Early Retirement .................................................................................................5

Optional Retirement At Involuntary Termination.... ...............................................6

Incapability Retirement .........................................................................................6

YOUR PLAN BENEFIT FORMULAS ...........................................................................7

DEFINITION OF SERVICE (FULL AND LIMITED SERVICE EMPLOYEES) .................7

DEFINITION OF HIGH-THREE YEARS' PAY ............................................................8

DEFINITION OF PRIMARY SOCIAL SECURITY BENEFIT (PSSB) ............................9

EXAMPLES OF RETIREMENT BENEFITS .................................................................9

OPTION TO DELAY START OF PENSION PAYMENTS ............................................11

INCOME-LEVELING OPTION FOR PRE-AGE 62 RETIREMENT..............................11

Examples of Income Leveling..............................................................................12

SUMMARY OF SURVIVOR BENEFITS UNDER
THE PENSION & RETIREMENT PLAN ....................................................................13

COMPANY-PAID SURVIVOR BENEFITS .................................................................15

When You are Eligible .........................................................................................15

Who Can be Named as a Survivor .......................................................................15

Amount of Benefit ..............................................................................................15

Cost of Benefit ...................................................................................................15

Examples of Company-Paid Survivor Benefits .....................................................15

**A55**

D000130

# Pension and Retirement Plan—Table of Contents

PRE-RETIREMENT SPOUSE BENEFIT OPTION ........................................................ 16

    When Coverage Begins ................................................................................. 17

    Amount of Benefit ........................................................................................ 17

    Cost of Benefit ............................................................................................. 17

    Examples of Pre-Retirement Spouse Benefit Option ..................................... 17

POST-RETIREMENT SPOUSE BENEFIT OPTION ...................................................... 17

    When Coverage Begins ................................................................................. 18

    Amount of Benefit ........................................................................................ 18

    Cost of Benefit ............................................................................................. 18

    Example of Post-Retirement Spouse Benefit Option ..................................... 18

WAIVER RULES FOR MARRIED PARTICIPANTS ...................................................... 19

POST-RETIREMENT JOINT AND SURVIVOR OPTION ............................................. 19

    When You Are Eligible ................................................................................. 19

    Benefit Amount ........................................................................................... 19

    Cost of Benefit ............................................................................................. 20

    Election and Revocation ............................................................................... 20

    Example of Post-Retirement Joint and Survivor Option ................................ 20

VESTED DEFERRED PENSION ................................................................................. 21

    When You Are Vested .................................................................................. 21

    Benefit Amount ........................................................................................... 21

    When Payments Begin ................................................................................. 21

PRE-PAYMENT SPOUSE BENEFIT COVERAGE
UNDER VESTED DEFERRED PENSION .................................................................... 22

    Amount of Benefit ........................................................................................ 22

    Cost of Pre-Payment Benefit ....................................................................... 22

**A56**

D000131

# Pension and Retirement Plan—Table of Contents

POST-PAYMENT SPOUSE BENEFIT COVERAGE
UNDER VESTED DEFERRED PENSION .................................................................23
    Amount of Benefit.................................................................................................23
    Cost of Post-Payment Benefit ...........................................................................23

BREAKS IN SERVICE AND COMPUTATION PERIODS .....................................23

IF YOU ARE REEMPLOYED ....................................................................................24
    Before retirement: ...............................................................................................24
    After retirement: ..................................................................................................24

APPLYING FOR BENEFITS........................................................................................25

## Administration Information

PLAN NAME AND IDENTIFICATION NUMBERS .....................................................25

TYPE OF PLAN AND PLAN YEAR..............................................................................25

PLAN ADMINISTRATION AND FUNDING ..............................................................25

QUALIFIED DOMESTIC RELATIONS ORDERS ......................................................25

LIENS ..........................................................................................................................26

INSURED BENEFITS ..................................................................................................26

MAXIMUM BENEFIT LIMITATION ........................................................................26

IRS APPROVAL...........................................................................................................26

PLAN DOCUMENTS...................................................................................................26

YOUR RIGHTS UNDER ERISA .................................................................................27

USING ERISA'S CLAIMS PROCEDURES .................................................................28

IF YOUR CLAIM IS DENIED.....................................................................................28

FUTURE OF THE PLAN .............................................................................................29

**A57**

D000132

# Pension and Retirement Plan

## WHO IS ELIGIBLE

All full-service employees of DuPont are eligible to participate in the **DuPont Pension and Retirement Plan** beginning on the first day of DuPont employment.

### Normal Retirement Age
The normal retirement age under the **Pension and Retirement Plan** is the later of age 65 or, for employees who begin participation in the Plan after age 60, the fifth anniversary of the date when Plan participation began.

## WHEN YOU MAY RETIRE

### Normal Retirement
You are eligible for an unreduced normal pension if you are a full-service employee, at least 65 years old, and have at least 15 years of service. If you qualify for a normal retirement, your pension is calculated by the three formulas outlined on page 7. The formula producing the highest benefit is used.

### Early Retirement
You are eligible for an early pension after reaching age 50 (but before reaching age 65) with at least 15 years of service if you are a full-service employee. If you qualify for an early retirement, your pension is calculated by the three plan benefit formulas outlined on page 7.

The formula producing the highest benefit is used. An unreduced benefit is available if you retire between ages 58 and 65, and if your service and age add up to 85 or more; otherwise, you can retire with a reduced pension.

The graph that follows indicates the various age and service combinations necessary for an unreduced early pension. It also shows the percentage of pension you can receive under other age and service combinations.

Let's say, for example, that your pay and service entitle you to an age 65 benefit of $1000 a month; you have 23 years of service and you are age 60. This graph indicates that, if you decide to retire now, you would receive 90% of your $1000 pension--or $900 a month. If you wait until you are 61 to retire, you would then have another year of service and age and would be entitled to an unreduced benefit.



| (Age) | 15-20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 & over |
|---|---|---|---|---|---|---|---|---|
| 65 | 100% | | | | | | | |
| 64 | 95 | 100% | | | | | | |
| 63 | 90 | 95 | 100% | | | | | |
| 62 | 85 | 90 | 95 | 100% | | | | |
| 61 | 80 | 85 | 90 | 95 | 100% | | | |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 |

Years of Service

**A58**

D000133

**Pension and Retirement Plan**

## Optional Retirement At Involuntary Termination

The pension plan may also provide benefits for full-service employees who are terminated involuntarily. If you are terminated involuntarily (other than when your employment is terminated to permit you to be employed by the buyer of Company assets, a joint venture of the Company, or for a service provider or you are terminated for dishonesty, insubordination, or other misconduct), but are over age 50 with at least 15 years of service, you are eligible for an optional pension.

If you are terminated involuntarily for lack of work and have at least 25 years of service, you may be eligible for an optional pension as early as age 45. The 25-year service requirement is reduced by two years for each year past your 45th birthday.

| AGE | SERVICE REQUIRED |
|-----|------------------|
| 45  | 25 |
| 46  | 23 |
| 47  | 21 |
| 48  | 19 |
| 49  | 17 |
| 50  | 15 |

If you qualify for optional retirement, your pension is calculated by the three formulas shown as on page 7. The formula producing the highest benefit is used. Your benefit is then reduced by 5/12ths of 1% for each month between the time you leave and the time you would have become eligible for an unreduced pension.

Here is an example of how an optional pension is calculated.

Frank White is 54 with 23 years of service when he is involuntarily terminated. With this combination of age and service, he meets the requirements for optional retirement (over age 50 with at least 15 years' service). Under the formulas, Frank's pension is $1,300. However, he is four years (48 months) away from being eligible for an unreduced early pension per the chart on page 5 (age 58 with 27 years of service); therefore, his pension is reduced as follows:

5/12ths of 1% (.004167) times 48 months times $1,300 = $260.

Frank's optional pension is $1,040 per month ($1,300 minus $260).

## Incapability Retirement

As a full-service employee with at least 15 years of service, you may be able to retire with an incapability pension - if you are deemed permanently incapable of doing your job with the required degree of efficiency. If you qualify for an incapability retirement, your pension is calculated by the three formulas shown on page 7. The formula producing the highest benefit is used, and there is no reduction for early retirement. In addition, you may receive an incapability supplement equal to either:

- 50% of your Primary Social Security Benefit (PSSB), or

- $90 a month

# Pension and Retirement Plan

...whichever is greater. You receive this supplement until you either begin receiving a Social Security disability benefit or reach age 62, whichever is the first to occur.

More information on DuPont's disability income resources can be found in the **Disability Plans** booklet.

## YOUR PLAN BENEFIT FORMULAS

Because there are many different jobs, functions, and pay histories at DuPont, the pension plan uses three formulas to assure that your retirement income is based on your individual situation. Payments are automatically based on the formula that generates the highest pension for you. However, your benefit as calculated under Formula A or Formula B, when added to your Primary Social Security Benefit (PSSB)— as determined at the time of your retirement—may not exceed your average monthly pay.

Formula A involves your years of service, your high-three years' pay, and a multiplier percentage.

### Formula A

1.2% x Service x High-Three Years' Pay = Your Monthly Pension

Formula B is like Formula A, but it uses a somewhat higher multiplier percentage and includes consideration of your Primary Social Security Benefit (PSSB).

### Formula B

1.5% x Service x High-Three Years' Pay - 1/2 of your PSSB = Your Monthly Pension

Formula C uses a dollar multiplier, your service, and a percentage of your average monthly pay.

### Formula C

$9 x Service + (10% of High-Three Years' Pay) = Your Monthly Pension

## DEFINITION OF SERVICE (FULL AND LIMITED SERVICE EMPLOYEES)

Your service time is important for three different purposes under the plan. The first is to determine whether you are vested, which means that benefits you have accrued under the plan are nonforfeitable (cannot lose). For full-service employees (FSEs) vesting requires 5 full years of service. For Limited Service Employees (LSEs), every time you work at least 1,000 hours in your 12-month computation period, you receive credit for a year of service toward vesting. (See page 23 for an explanation of computation periods.) Generally, you need five years of service in order to become vested in the plan.

Service is also important for the purpose of benefit accrual in the calculation of your benefit. For full-service employees (FSEs), length of service for benefit accrual purposes is "continuous service" as determined under the Company's Continuity of Service Rules,

A60    D000135

## Pension and Retirement Plan

that is, the time elapsed since your date of hire (or rehire) including any prior service which has been restored. For limited service employees (LSEs), length of service is determined by "actual time" worked. For example, if an LSE works 1,040 hours in a 12-month computation period, the LSE is credited with one-half year of service for benefit calculation purposes. (Note that in this example. LSEs are credited with one year of service for vesting purposes but only one-half year of service for benefit accrual purposes.) The type and length of your service is also important in determining the benefits for which you are eligible under the plan. For example. full-service employees with 15 years or more of service are eligible for Company-paid survivor benefits and early retirement benefits as described above.

LSEs. however. are entitled only to benefits under the provision of vested deferred pensions (see page 21) and are not eligible for the same retirement options and survivor benefits as FSEs. For more information on LSEs. See "Breaks In Service And Computation Periods." on page 23

NOTE:   If you leave DuPont and are later reemployed. you may incur a break in service which could affect the amount of your benefit. For more details. see page 24.

## DEFINITION OF HIGH-THREE YEARS' PAY

Your high-three years' pay is the average of your monthly compensation during your highest-paid 36 consecutive months. or during the three calendar years in which

your pay is the highest. The idea here is to base your benefits on your living standard near retirement. For example, Bob is retiring at the end of 1997 at age 65 after 30 years of service. His average monthly pay for the years 1991 through 1997 is:

| YEAR | AVERAGE MONTHLY PAY |
|------|---------------------|
| 1991 | $1,625 |
| 1992 | $1,700 |
| 1993 | $1,790 |
| 1994 | $1,875 |
| 1995 | $1,975 |
| 1996 | $2,070 |
| 1997 | $2,175 |

The three years which represent his highest monthly pay are 1995, 1996, and 1997. The average monthly pay for these three years comes to $2,073.33 and is, in effect, the highest-paid 36 consecutive months. This amount is used to calculate Bob's pension benefit.

High-three years' pay includes overtime, shift differentials and any Variable Compensation Awards. It does not include:

- awards and payments under any other special compensation plans, or

- payments for severance, relocation, or other special payments. or

- pay in excess of legally restricted amounts.

**A61**

D000136

# Pension and Retirement Plan

## DEFINITION OF PRIMARY SOCIAL SECURITY BENEFIT (PSSB)

Your Primary Social Security Benefit (PSSB) used in Formula B is the Social Security benefit you are entitled to receive based on:

- your DuPont earnings, and

- the Social Security law in effect on January 1 of the year you retire or terminate.

If DuPont has no record of your actual earnings, estimated earnings based on changes in national average earnings as determined by the Social Security Administration will be used to calculate your PSSB. You have the right to supply documentation of your actual earnings from the Social Security Administration within 30 days following the later of the date you leave DuPont and the date you received benefit entitlement notification. Using actual earnings can increase or decrease your PSSB.

It is important to keep in mind that while Formula B uses PSSB to calculate your pension benefit, this has no effect on the amount of Social Security benefit you actually receive from the government. The plan considers only the Social Security benefit you earn while on DuPont's payroll (rather than over your total employment history). This may work to your advantage if you worked somewhere else prior to joining DuPont because your actual Social Security benefit may be higher when all your earnings are calculated.

Once your pension benefit is determined at retirement, any future increases in Social Security do not affect it.

Today, Social Security benefits are payable as early as age 62. If you are younger than 62 when you retire, the Social Security figure used for Formula B is an estimate of what you are likely to receive at age 62.

## EXAMPLES OF RETIREMENT BENEFITS

Here are three examples that show how the three pension plan formulas work. Your benefit—and which formula yields the highest pension amount—depends on your age, service, pay, and Primary Social Security Benefit amounts.

### John Austin

John is retiring at age 65 with 35 years of DuPont service. His high-three years' pay works out to $2.750 a month. He is entitled to a Social Security benefit of $922 a month. However, his Primary Social Security Benefit based only on his DuPont earnings is $916 a month. John's pension benefit is calculated below:

- FORMULA A
1.2% x 35 x $2,750 = $1,155

- FORMULA B
1.5% x 35 x $2,750 - (50% x $916) = $986

- FORMULA C
$9 x 35 + (10% x $2.750) = $590

**A62**

D000137

# Pension and Retirement Plan

In John's case, Formula A yields the highest amount. The pension John receives is $1,155 a month for life. Combined with his Social Security benefit of $922 a month, John's total retirement income is $2,077 a month. If his wife is also entitled to Social Security equal to one-half his benefit, their combined retirement income is $2,538 a month.

## Sarah Gladstone

Sarah is retiring at age 65 after a 30-year career with DuPont. Her high-three years' pay averages out to $4,000 a month, and her Social Security benefit (for purposes of this example) is $1,019 a month. The PSSB based only on her DuPont earnings is $994 a month.

Sarah's benefits are figured below:

- FORMULA A
  1.2% x 30 x $4,000 = $1,440

- FORMULA B
  1.5% x 30 x $4,000 - (50% x $994) = $1,303

- FORMULA C
  $9 x 30 + (10% x $4,000) = $670

In Sarah's case, Formula A provides the highest pension. Combined with her $1,019 Social Security benefit, Sarah's total retirement income is $2,459 a month.

## Al Stevens

Al retires early at age 62 after completing 30 years of service. His high-three years' pay comes to $5,000 a month, and he is eligible for a Social Security benefit of $816 a month. His PSSB, based on his DuPont earnings only, is $778 a month.
Al's pension calculations are:

- FORMULA A
  1.2% x 30 x $5,000 = $1,800

- FORMULA B
  1.5% x 30 x $5,000 - (50% x $778) = $1861

- FORMULA C
  $9 x 30 + (10% x $5,000) = $770

Formula B yields the highest amount. Al receives $1,861 a month from the plan plus $816 from Social Security (his actual age 62 benefit)--a total of $2,677 a month.

## A FEW NOTES ABOUT THESE EXAMPLES

First, the examples do not take into account any survivor benefit options these employees may choose (Company-paid survivor benefits do not affect the amount of a pension.) Choosing another survivor benefit option reduces the amounts shown.

Second, the examples do not take taxes into account. This is important because high-three years' pay is based on before-tax (gross) earnings and people live on their after-tax earnings (take-home pay). A comparison between these employees' take-home pay and their after-tax retirement income may be even more favorable than these figures suggest. Therefore, spendable income may be even closer to take-home pay. The point is, if you are a long-service employee, your DuPont pension, when combined with Social Security, can replace a substantial portion of your pre-retirement earnings.

# A63

D000138

## Pension and Retirement Plan

### OPTION TO DELAY START OF PENSION PAYMENTS

When you retire, you may elect to receive pension payments immediately or choose to delay the beginning of payments until some time in the future. If you decide to delay pension payments, other retiree benefits such as health care and life insurance coverage will begin immediately upon retirement. The Company's health care contribution (defined as medical and dental coverage) is based on your age and service *at retirement*. When you elect to start pension payments, the pension is based on (1) service at retirement and (2) age at the time pension payments begin (payment start date).

After reaching age 58, if your years of service plus your age equal at least 85, you are eligible to receive 100% of your pension. If, for example, you retire at age 55 with 27 years of service, you are entitled to 85% of your pension (see graph on page 5)

However, if you wait until you're 58, you will receive an unreduced pension for as long as you live. You should initiate the process to commence pension payments no later than 90 days prior to your planned payment start date. The start date is the first of the chosen month, with payment made at the end of that month. During this process, the following elections are made (in lieu of making them at retirement):

- Income leveling, if you are under age 62 when payments start.

- Post-retirement spouse benefit option (see page 17 for detailed explanation).

- Post-retirement joint and survivor option. Retirees who are eligible at the time of retirement for this option may elect, change, or revoke this option up to 30 days prior to the benefit commencement date (see page 19 for detailed explanation).

The pre-retirement spouse benefit option will continue, unless waived, until the benefit commencement date (see page 16 for more information).

### INCOME-LEVELING OPTION FOR PRE-AGE 62 RETIREMENT

If you retire with an early or optional pension before age 62 (the earliest age that you can begin receiving Social Security benefits), you may choose DuPont's income-leveling option. The income leveling option provides an increased monthly benefit from the DuPont pension plan during the years before you are eligible for Social Security. Then, once Social Security becomes payable, benefits from the DuPont plan are reduced, so that your monthly benefit is approximately the same throughout your retirement. This reduction will be made whether or not you actually apply for Social Security beginning at age 62.

If you are considering the income-leveling option, remember that you must choose the option before pension payments begin; it cannot be elected after the pension payment start date.

Two examples of how the income-leveling option might work follow.



**A64**

D000139

## Pension and Retirement Plan

## EXAMPLES

### Dave Palmer

Dave Palmer, a 60-year old DuPont employee, is thinking about retirement. He has 30 years of service and is eligible for an unreduced retirement benefit. Using 30 years of service and high-three years' pay of $3,000 a month, Dave's benefit beginning at age 60 is $1,080. Since Dave is not eligible for Social Security retirement benefits until age 62, he considers the income-leveling option. The income leveling option basically provides more level income from both Social Security and the DuPont pension plan throughout retirement. Plan payments are increased until Social Security becomes payable and decreased thereafter.

Depending on the plan's interest rate when he retires, Dave may receive $1,690 a month from the plan until he reaches age 62 at which time his plan benefit drops to $950 a month; however, he is now eligible to collect a Social Security benefit of at least $740 a month. His total retirement income from the plan plus Social Security is about the same before and after age 62 (see the chart on page 13).

### Sarah Gladstone

Earlier, on page 10, we outlined an example of benefits for Sarah Gladstone. Sarah retires at age 65 with 30 years of service and high-three years' pay of $4,000 a month. Her age 65 plan benefit is $1,440 a month plus $1,019 a month in Social Security for a total retirement income (not including her husband's Social Security) of $2,459 a month.

Now let's assume Sarah decided to retire at age 58 with 23 years of service. This is how the income leveling option would work for her. Her high-three years' pay ($3,400 a month at age 58), 23 years of service, and estimated age 62 Social Security benefit of $766 are put through the three formulas. The result is a plan benefit of $939 a month. From the chart on page 5, note that Sarah would collect a reduced benefit at age 58. The $939-a-month benefit is multiplied by 80%; the result would be rounded to $751 a month. Note also that Sarah has another option: she could delay the start of her pension payments until age 62 and receive $939 a month (see page 13).

## A65

D000140

# Pension and Retirement Plan



Income Leveling, Dave Palmer



Income Leveling, Sarah Gladstone

If Sarah chooses the income-leveling option, she receives about $1,294 a month throughout retirement. From age 58 to 62, the $1,294 is paid entirely by the Pension and Retirement Plan. At age 62, Sarah applies for Social Security and begins receiving a benefit of at least $766 a month which, when added to her new plan payment of $528 a month, keeps her retirement income at $1,294 a month (see chart above).

## SUMMARY OF SURVIVOR BENEFITS UNDER THE PENSION & RETIREMENT PLAN

Under federal laws that took effect in 1976 and in following years, plans like the **DuPont Pension and Retirement Plan** are required to make available a benefit for the spouses of eligible employees and pensioners. Actually, DuPont took action

long before the federal government. It introduced survivor benefits for employees and pensioners in 1959, offering coverage not only for spouses but for others as well. Then, in 1966, the Company-paid survivor benefit was added to the plan. The federal laws expanded this coverage to some extent. So today, there are many spouse and survivor benefit coverages under the plan:

- spouse survivor coverage for vested employees (usually five but fewer than 15 years of service);

- Company-paid survivor benefits for full-service employees with at least 15 years of service;

- pre-retirement spouse benefit option;

- post-retirement spouse benefit option;

- post-retirement joint and survivor option.

13

**A66**

D000141

# Pension and Retirement Plan—Administration Information

The Employee Retirement Income Security Act (ERISA) was the first federal law that had an effect on survivor benefits under pension plans like the DuPont plan. As of January 1, 1976, it required that all plans offer a "Qualified Joint and Survivor Annuity" for the surviving spouses of pensioners or eligible active employees who died within ten years of their normal retirement dates. If this coverage were elected by the employee, the spouse would receive a benefit after the death of the pensioner or employee that equals at least 50% of the benefit the pensioner or employee would have received as a pension if the full cost of the survivor coverage was charged against his or her pension. The law permitted employers to charge for this benefit by reducing the amount of the pension benefit paid to the employee at retirement

Of course, DuPont already had a Company-paid survivor benefit for full-service employees with at least 15 years of service that provided, at no cost to the employee, much of the coverage required under ERISA. To make up the difference between the required benefit and the Company-paid survivor benefit, DuPont introduced the pre-retirement spouse benefit option and the post-retirement spouse benefit option, whereby the employee's pension is reduced to pay for this additional coverage, when it is elected

Then, during the 1980s, additional laws were passed. One required that an employee could not waive the surviving spouse coverage without the written consent of the spouse (see **"Waiver Rules For Married Participants,"** page 19). Another required that pre-retirement spouse benefit coverage be provided for any employee who was vested in a pension plan. These benefits for vested persons are described beginning on page 22 in the section on vesting.

For active, full-service employees with 15 years or more of continuous service and those retiring with optional or incapability retirement pension, here is how the DuPont plan provides the surviving spouse coverage that meets the test required by law:

- When you attain 15 years of service, the Company-paid survivor benefit, by itself, meets the test of the law until you attain age 55.

- When you reach age 55, the Company-paid survivor benefit, combined with the pre-retirement spouse benefit option meets the test of the law.

- When you retire on a normal/early/incapability or optional pension, the Company-paid survivor benefit, combined with the post-retirement spouse benefit option (for which you are charged by having your pension reduced), meets the test of the law at any age.

Details of these benefits are on the following pages. You may choose from a variety of survivor benefit options. But remember—if you are married and do not wish to provide the legally mandated coverage for your spouse, you must have your spouse's written consent.

# Pension and Retirement Plan—Administration Information

## COMPANY-PAID SURVIVOR BENEFITS

DuPont's Pension and Retirement Plan includes survivor income features that span both your active career and your retirement years. One of the most important is Company-paid survivor benefits.

### When You are Eligible

If you are a full-service employee, have at least 15 years of service with DuPont, and die while an employee or after you retire with a normal/early/ incapability or optional pension, survivor benefits are paid after your death to your designated eligible survivors.

### Who Can be Named as a Survivor

Under the plan, you can specify as your survivor(s):

- your spouse and minor children;
- your minor children only; or
- one of your parents or one of your stepparents.

If you do not include your spouse as a survivor, you must have his or her written consent. See "Waiver Rules for Married Participants," on page 19.

See "Waiver Rules for Married Participants," on page 19.

NOTE: Employees are restricted from specifying a non-spouse beneficiary until the year in which employees become age 35.

You may change your survivor designations at any time. If the change is in favor of a non-spouse beneficiary, you must obtain spousal consent. If for some reason you do not specify a survivor, the plan trustee pays benefits to your spouse and then to all minor children after your spouse's death.

If you designate your spouse and minor children as your survivors, payments continue for as long as your spouse lives. When your spouse dies if there are still children under age 21 (whom you have specified), benefits will continue to them. Payments to your children are made in equal shares until they reach age 21. If you name a parent or stepparent as your survivor, payments stop at their death.

### Amount of Benefit

Separate formulas are used to calculate the Company-paid survivor benefits. Specifically, the amount paid is the greater of either:

$$\text{Service} \times \text{High-Three Years' Pay} \times 0.5\%$$
$$= \text{Survivor Monthly Income}$$

or

$$\text{Service} \times \$4 + 4\% \text{ of High-Three Year's Pay}$$
$$= \text{Survivor Monthly Income}$$

### Cost of Benefit

The cost of providing this benefit coverage is paid entirely by DuPont.

### Examples of Company-Paid Survivor Benefits

Here are two examples of how Company-paid survivor benefits are calculated. In each case, the higher of the two benefits is payable.

A68

D000143

# Pension and Retirement Plan—Administration Information

## Eric Mason

Eric Mason is a 60-year-old DuPont employee with 25 years of service. His high-three years' pay is $2,500 a month. Eric designated his spouse and two minor children as his survivors. The Company-paid survivor benefit that Eric's wife would receive at his death as an active employee is calculated as follows:

$$25 \times \$2,500 \times 0.5\% = \$312.50,$$
$$\text{rounded to } \$313$$

or

$$25 \times \$4 + (4\% \times \$2,500) = \$200$$

So, in this case, the benefit for Eric's wife is $313 (the higher amount) a month. Then, if Eric's two children are still minors at the death of his wife, each receives $157 a month ($313 divided by 2 = $156.50, rounded up) until reaching age 21. Unless waived with her consent, Eric's wife also receives an amount based on the pre-retirement spouse benefit option.

Here is another example of the Company-paid survivor benefit.

## Betty Elliott

Betty Elliott retired at age 65 with 35 years of service. Her high-three years' pay was $2,900 a month at retirement. At her death, the Company-paid benefit to her survivor is figured below:

$$35 \times \$2,900 \times 0.5\% = \$507.50,$$
$$\text{rounded to } \$508$$

or

$$35 \times \$4 + (4\% \times \$2,900) = \$256$$

The larger amount, $508 a month, is paid to Betty's husband for life; at his death, it is divided among any specified minor children until age 21; or, Betty can specify, with her husband's consent, that the benefit be paid to a parent or stepparent for his or her lifetime.

Two other rules to keep in mind:

- If your specified survivor (other than a minor child) is more than five years younger than you, the benefit is actuarially reduced to reflect the age difference.

- Also, if your pension is reduced because of early or optional retirement (see pages 5 & 6), the same reduction also applies to the Company-paid survivor benefit.

For example, earlier on page 10, a hypothetical benefit for Sarah Gladstone, age 58 with 23 years of service was calculated in an earlier example. Sarah's pension is reduced by 20% for early retirement. Assuming her husband is age 52, his survivor benefit also is reduced by 20% to account for Sarah's early retirement and further reduced by 2% because he is six years younger than Sarah.

## PRE-RETIREMENT SPOUSE BENEFIT OPTION

In addition to the Company-paid survivor benefit, the DuPont plan includes a pre-retirement spouse benefit option and a post-retirement spouse benefit option for full-service employees. Each option combines with your Company-paid survivor benefit to

D000144

# Pension and Retirement Plan—Administration Information

meet the surviving spouse coverage test required under federal law. This section describes the pre-retirement spouse benefit option. The post-retirement option is described later.

## When Coverage Begins

Coverage under the pre-retirement spouse benefit option is automatically combined with the Company-paid survivor benefit when you, as a full-service employee, reach age 55 and have at least 15 years of service, unless you and your spouse notify the Company in writing that you wish to waive the legally required coverage. (See "Waiver Rules for Married Participants." page 19). You may revoke, with spousal consent, or reelect this coverage at any time while you are still actively working at DuPont. At the time of your pension payment start date. this coverage ends. but post-retirement spouse benefit coverage begins. unless you waive it.

## Amount of Benefit

First. note that the pre-retirement spouse benefit option applies only to your legal spouse (not children or parents or any other beneficiary). Payments to your spouse under this option are combined with the Company-paid survivor benefits described in the previous section. Under the pre-retirement spouse benefit option, your wife or husband receives a lifetime benefit equal to 10% of the pension you are entitled to had you retired at the time of your death. When this 10% benefit is added to the benefit provided under the Company-paid survivor benefit. the total is at least equal to the payment amount required by law.

## Cost of Benefit

The cost of providing this benefit coverage is paid entirely by DuPont.

## Examples of Pre-Retirement Spouse Benefit Option

Bill Remsky elected the pre-retirement spouse benefit option at age 55 and died 36 months later at age 58, while still an active employee. Let's assume that under the plan formulas, Bill's pension at age 58 is $700 a month.

Under this option. Bill's wife receives 10% of his pension, $70 a month. This $70 is added to the Company-paid survivor benefit amount and paid monthly for her lifetime. At her death, payment of the spouse benefit option portion ($70) stops, but the company-paid survivor benefit is divided among any specified minor children and paid to them until age 21.

Remember. if Bill's widow is more than five years younger than he is, her Company-paid survivor benefit amount is subject to reduction.

# POST-RETIREMENT SPOUSE BENEFIT OPTION

In addition to the pre-retirement spouse benefit option described above, the DuPont plan includes a post-retirement spouse benefit option for full-service employees.

**A70**

D000145

# Pension and Retirement Plan—Administration Information

## When Coverage Begins

Coverage under the post-retirement spouse benefit option is automatically combined with the Company-paid survivor benefit if:

- you are married when you retire; and

- you retire with a normal/early/ incapability or optional pension.

If you do not want this coverage, you must waive the coverage with your spouse's written consent. (See "Waiver Rules for Married Participants"). You may not revoke or reelect this coverage after your pension payment start date. If, after your retirement, your spouse dies before you do, no survivor benefits are payable under this post-retirement spouse benefit option. The reduction applied to your pension to provide this option remains unchanged. However, you can then designate a plan-qualified survivor for the Company-paid survivor benefit–minor children, parent, stepparent, or a spouse, if you remarry.

## Amount of Benefit

The post-retirement spouse benefit option, like the pre-retirement option, applies only to your legal spouse (not children or parents or any other beneficiary). Payments to your spouse under this option are combined with the Company-paid survivor benefits described earlier in this booklet.

Under the post-retirement spouse benefit option, your spouse receives a lifetime benefit equal to approximately 10% of the pension you received at the time of your death. When this benefit is added to the benefit provided under the Company-paid survivor benefit, the total spouse benefit is at least equal to the payment amount required by law. At the death of your spouse, all benefits under this option end, but benefits under the Company-paid survivor benefit continues to your eligible minor children until age 21.

## Cost of Benefit

The cost for the post-retirement spouse benefit option comes out of the pension you receive when you retire and start pension payments. The amount your pension reduces is actuarially determined, taking into account your age and the age of your spouse as of your retirement date, and the plan's investment-return rate. For more information on this type of actuarial reduction, see the upcoming "Frank Warren" example.

## Example of Post-Retirement Spouse Benefit Option

Barbara Miller chooses the post-retirement spouse benefit option upon taking a normal retirement (age 65). Barbara also had the pre-retirement spouse benefit option in effect for ten years prior to her retirement. Her DuPont pension came to $1,417 a month. At Barbara's death, her husband receives 10% of that amount (rounded to $142 a month) for life from the post-retirement spouse benefit option. This $142 payment is combined with the amount payable to Barbara's husband under the Company-paid survivor benefit. However, Barbara's own monthly pension benefit while she is living is reduced from the $1,417 amount to $1,395 to pay for the cost of providing the post-retirement spouse benefit option.

# A71

Pension and Retirement Plan—Administration Information

## WAIVER RULES FOR MARRIED PARTICIPANTS

Under the provisions of a federal law enacted in 1984, if you are married and do not want to provide survivor benefits for your spouse under the pension plan, both you and your spouse must agree to waive these coverages, in writing, at various times throughout your career and before you retire. You may obtain a waiver form from DuPont Connection (800-775-5955). Your spouse's signature on the waiver form must be witnessed by a notary public. If your spouse cannot be located, or if you are legally separated pursuant to a court order, contact DuPont Connections (800-775-5955) to obtain a "Missing Spouse Affidavit".

## POST-RETIREMENT JOINT AND SURVIVOR OPTION

The DuPont Pension and Retirement Plan also provides a post-retirement joint and survivor option for full-service employees. Under this option, you may name anyone to be the beneficiary, not just your spouse or the survivor you specified for the Company-paid survivor benefits described earlier in this booklet.

### When You Are Eligible

You are eligible to elect this option after you reach age 50 with at least 25 years of service or at any age-plus-service combination that entitles you to an unreduced pension, e.g.:

| Employee's Age | Required Service |
|---|---|
| 61 | 24 |
| 62 | 23 |
| 63 | 22 |
| 64 | 21 |
| 65 or older | 5 or more |

You must elect a post-retirement joint and survivor option at least 30 days before your benefit commencement date, and you must actually retire and commence pension payments in order to provide this additional survivor benefit.

### Benefit Amount

You may choose to provide your beneficiary with any multiple of 10% of your calculated pension as long as the sum of all survivor benefits does not exceed your actuarially-reduced pension. Your pension is reduced to pay this benefit (see "Cost of Coverage"). Benefits paid under this option begin the month after your death and continue for the lifetime of your beneficiary. Note that no benefit is paid under this option if you die before you retire and start pension payments from DuPont—even if you elected the option.

**A72**

D000147

# Pension and Retirement Plan---Administration Information

## Cost of Benefit

If you choose the post-retirement joint and survivor option, the reduction in your monthly pension is actuarially determined at the time you retire and commence pension payments. The amount of the reduction depends on the percentage of your pension you want paid to your beneficiary, the plan's investment-return rate. and the age of you and your beneficiary. For more information on this type of actuarial reduction, see the "Frank Warren" example below. The amount payable to your beneficiary, when combined with your Company-paid survivor benefit and any post-retirement spouse benefit option. cannot be more than the pension payable to you excluding any amounts determined under the income-leveling option or any incapability supplement. and after the reductions required to pay for these joint and survivor benefits

## Election and Revocation

Generally, once you elect the option. you may revoke it or change your beneficiary up to 30 days before your pension payment start date. but there is a 30-day waiting period before your new election is effective. Also. you cannot change it in the final 30 days unless your named beneficiary dies or you are retiring under an incapability or optional pension. If your beneficiary dies before you retire. the option you chose terminates. You may choose another option and name another beneficiary anytime before

retirement. If your beneficiary dies **before** you, but **after** you retire and start pension payments, no survivor benefit under this option is paid. Your own pension continues to reflect the reduction to pay for the option.

## Example of Post-Retirement Joint and Survivor Option

**Frank Warren** retires at age 65 and the pension he earns, after all other applicable adjustments, is $1,400 a month, payable for life. His wife is 62. Before retiring. Frank elects to provide additional monthly payments to his wife after his death equal to 20% of his pension under this option. Remember, these benefits are in addition to any other survivor benefits which Frank's wife may be eligible for under the post-retirement spouse benefit option and/or Company-paid survivor benefits.

Let's assume the plan's investment-return rate is 8% at the time of Frank's retirement. DuPont checks age tables that are a part of the Pension and Retirement Plan document. The tables show that. using the 8% investment-return rate, the cost for lifetime payments equal to 20% of Frank's pension to his wife (age 62) is 5.78%. This means Frank's pension is reduced as follows: $1.400 x 5.78% = $80.92; so $1,400 - $80.92 = $1,319.08. rounded up to $1,320. This is Frank's reduced monthly pension. At Frank's death after retiring. his wife begins receiving 20% of his calculated monthly pension. or $280 a month for life. Frank may elect a different percentage for his wife—10%, 30%, 40%, or maybe even 50% of his pension and a correspondingly larger reduction in his own pension.

D900148