# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MIKE V. MATA, | ( | |
| Plaintiff, | ( | |
| v. | ( | C.A. No. 05-423(KAJ) |
| E. I. DU PONT DE NEMOURS AND COMPANY, | ( | |
| a Delaware corporation; E. I. DU PONT DE | ( | |
| NEMOURS AND COMPANY, Plan Administrator; | ( | |
| And | ( | |
| PENSION AND RETIREMENT PLAN, | ( | |
| Defendants. | ( | |

**PLAINTIFF MIKE V. MATA'S**
**APPENDIX MATERIAL IN SUPPORT OF OPENING BRIEF**
**SUBMITTED PER SCHEDULING ORDER**
**AS OF MAY 1, 2006**



John M. Stull, Esq. (Del.Bar #568)
1300 N. Market Street, Ste 700
P. O. Box 1947
Wilmington, DE 19899
Ph. 302) 654-0399

- 1 -

D000049

# Calculation of CTP Payments

| 2004 CTP | | | | | |
|---|---|---|---|---|---|
| **Estimate of CTP Payment Amount*** | | | | | |
| CTP transition pay equals 1 month's pay for each 2 years of | | | | | |
| service with a minimum of 2 months' pay and a maximum of 12 months' pay. | | | | | |
| **STEP 1:** | Enter full name and Social Security Number (in Boxes Below) | | | | Date: |
| NAME | Mike Meta | | | | |
| | | | | | |
| SSN: | | 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 | | | |
| | | | | | |
| **STEP 2:** | Determine Eligible Pay (enter data in boxed areas) | | | | |
| | Your Regular Monthly Rate of Pay: | | | $ | 4,749.00 |
| | PLUS Shift differential and Sunday Premium (SSP) (see exclusions)** | | | | 0.00 |
| | PLUS Scheduled Overtime (SOA) (see exclusions)** | | | | 0.00 |
| | PLUS Regional or Global Variable Compensation (see exclusions)** | | | | |
| | Enter full amount of the Regional or Global Variable Compensation | $2,000.00 | Full amount / 12 = | | |
| | paid in the last 12 month period. | | | | |
| | Total Eligible Monthly Pay: | | | $ | 4,915.67 |
| | | | | | |
| **STEP 3:** | Service Determination | | | | |
| | | | | | |
| | Adjusted Service Date (ASD): [mm/dd/yyyy] | 05/08/1989 | | | |
| | | | | | |
| | Date of Separation (DOS): [mm/dd/yyyy] | 06/30/2004 | DOS plus 1 day: | 07/01/2004 | |
| | | Years | Months | Days | |
| | Service*** in years, months, Days: | 15 | 2 | 0 | |
| | Service Rounded (for Days): | 15 | 2 | 0 | |
| | Service in years (& fractional years): | 15.167 | | | |
| | | | | | |
| **STEP 4:** | CTP Pay Estimate | | | | |
| | Number of Months of CTP Transition Pay Eligibility [Service / 2]: | 7.583 | | | |
| | [NOTE: Minimum of 2, Maximum of 12 ] | | | | |
| | Estimated CTP Transition Pay: | | | | |
| | 7 Months of Pay @ Eligible Monthly Rate: | | $4,915.67 | | |
| | And a final Payment at 0.583 Months X Eligible monthly Rate: | | $2,867.31 | | |
| | Total CTP Payment: | | $37,277.00 | | |

A-2

D000059



E. I. du Pont de Nemours & Co., Inc.
1007 Market Street
Wilmington, DE 19898

January 31, 2000

MIKE V MATA
1819 GILPIN AVE APT 2
WILMINGTON, DE  19806-2305

Dear Mike,

The ADJUSTED SERVICE DATE in your personnel record has been changed
from Nov 1, 1991 to May 8, 1989

Reason for change: MANUAL CORRECTION
----------------------------------------

There are a number of possible reasons for this correction.  For example, the
new date may reflect one or more Leave of Absences, or you were rehired, or
your employment status changed, or you were credited for prior service,
or your prior Adjusted Service Date was inaccurate.

This change is being made in accordance with the Continuity of Service Rules
and may affect your accrued Pension benefit under the Pension Plan.  Please
review the employment history listed below and contact your-Site
Administrator if you feel there are any inaccuracies.

| Date | Status | Reason | Emp Type |
| ---------- | ------ | --------------------------------------- | -------- |
| 1991/11/01 | ACT | | REGL |

A - 3

D000318

# CONTINUITY

## OF

## SERVICE

## RULES

Originally Adopted – June 2, 1919

Last Amended – March 1, 1997

E. I. du Pont de Nemours and Company

A-4

D000319

## CONTINUITY OF SERVICE RULES

The following Rules have been adopted by E. I. du Pont de Nemours & Company to govern the determination of the length of an employee's continuous service under the Du Pont Company's various Industrial Relations Plans:

I.    DEFINITIONS

1.    For the purpose of these Rules:

(a) The term "the Du Pont Company" means E. I. du Pont de Nemours & Company and its predecessor, E. I. du Pont de Nemours Powder Company.

(b) A subsidiary of a company means a corporation in which such company owns more than 50% of the voting stock.

(c) An affiliate means any corporation in which the Du Pont Company owns, directly or indirectly, any part of the voting stock.

(d) The term "Full Service Employee" means any person designated by the Company as a full-time employee. Any Full Service Employee on the roll 12/1/85 who continues to work at least 20 hours per week on a regular basis will be considered a Full Service Employee.

(e) The term "Limited Service Employee" means any person designated by the Company as a temporary or part-time employee and who is employed either (1) on a temporary basis for less than one year or (2) on a part-time basis for no more than 1600 hours in any 12-consecutive month period.

(f) A break in service means separation from the service for any reason which results in the removal of an employee's name from the salary or wage roll and shall be concurrent with such removal, except as otherwise hereinafter provided.

II.    SERVICE

1.  For the purpose of these Rules:

(a) Service includes service with the Du Pont Company and with any company the property and business of which were acquired by the Du Pont Company prior to January 1, 1920.

(b) Service includes service to the extent specified by the Du Pont Company's Board of Benefits and Pensions or its delegate with any of the following companies:

    (1)  Companies the property and business of which were acquired, in whole or in part, by the Du Pont Company subsequent to January 1, 1920;

    (2)  Subsidiaries of companies the property and business of which have been acquired by the Du Pont Company;

    (3)  Companies affiliated with the Du Pont Company; and

    (4)  Companies with which the Du Pont Company is joined in a partnership or joint venture.

    (5)  Partnerships or joint ventures in which the Du Pont Company has an ownership interest.

(c) Service is not credited to any individual who is employed as a Limited Service Employee.

2.  Time covered by payments in lieu of notice of termination of employment or by other payments at time of termination shall not count in the calculation of service for which employees may receive credit.

3.  Time covered by payment pursuant to Section XI A. (1) (b) of the Pension and Retirement Plan shall not be taken into account in calculating the service for which employees may receive credit under the Pension and Retirement Plan for purposes of benefit accrual or for purposes of eligibility.

III. LENGTH OF CONTINUOUS SERVICE

The length of an employee's continuous service as of any date is the period of time which has elapsed since the employee's

D000320

original date of employment, or the date of his reemployment following the last break in his service, whichever is the later date, except as otherwise provided herein.

IV.    ABSENCES WHICH DO NOT CONSTITUTE BREAKS IN SERVICE

1.    The following absences or separations will not constitute breaks in service, and full service credit, equivalent to that resulting from actual service, will be given for the time covered by such absences or separations:

(a) Absences with permission for a period of not more than sixteen consecutive calendar days for which no formal leave of absence is required;

(b) Absences on vacation with pay;

(c) Time covered under the Short-Term Disability Plan or by formal leave of absence on account of occupational or non-occupational disability, or for time carried on the Personal Injury Roll.

(d) Time spent in military, Merchant Marine, or specialized Government service as defined by the Du Pont Company during World War II and thereafter if entered upon prior to April 1, 1947, and if reemployed under conditions provided by law, or by Du Pont Company action if more liberal; or

(e) Time spent in active military training and service, as defined by the Du Pont Company during the period between April 1, 1947, and January 31, 1955 (the end of the Korean emergency), and thereafter, if entered upon during that period, provided that such service did not exceed a total of fifty-one months plus any period of additional service imposed pursuant to law and if reemployed under conditions provided by law or by Du Pont Company action if more liberal; or

(f) Time not to exceed a total of fifty-one months (unless an extension is required under provisions of the applicable Military Selective Service Act) spent in active military training and service if entered upon after January 31, 1955, or time on active duty for training in the Reserve Forces if entered upon on or after January 1, 1956, as such terms shall be defined

D000321

- 4 -

D000322

by the Du Pont Company and if reemployed or
returned to active employment pursuant to Law or
Du Pont Company action if more liberal; or

(g) Time spent in the course of temporary duties
outside the Company, which duties are undertaken
at the request or with the approval of the
Du Pont Company, provided that employees in such
cases are granted leaves of absence authorized,
approved, or ratified by the Board of Benefits
and Pensions, or its delegate, specifically
under this sub-paragraph.

(h) Time, not to exceed six months in any twelve
month period during which the employee would
otherwise be accruing service if he were not on
a leave of absence, when an employee with a
minimum of one year of continuous service
voluntarily and with Management approval elects
a leave of absence without pay to continue a job
for another employee who would otherwise be
terminated for lack of work at a location where
the Company has announced an excess employment
force.

2. Except as provided in paragraph 1 of this Section,
time covered by formal leave of absence on full or
part pay will not constitute a break in service, and
full service credit will be given for the time
covered by such absences except in determining the
number of years of service for computing the amount
of a pension.

3. Absences or separations under the following
circumstances will not constitute breaks in service,
but no service credit will be given for the time
covered by such absences or separations:

(a) Except as provided in paragraph 1 of this
Section, formal leave of absence without pay;

(b) Termination on account of lack of work in case a
former employee of the Du Pont Company or an
affiliated company that has been designated
under Section II-1 (b) is reemployed by the
Du Pont Company;

(c) Termination for any reason other than on account
of lack of work in case a former employee of the
Du Pont Company or an affiliated company that
has been designated under Section II-1 (b) is
reemployed by the Du Pont Company and if
subsequent to reemployment following such

8-H

- 5 -

D000323

termination the employee has acquired one year of continuous service; provided, however, that this one-year requirement will be waived for the purpose of the Pension and Retirement Plan if the employee retires or is involuntarily terminated for reasons other than discharge for dishonesty, insubordination or other misconduct, and if at the time of such retirement or termination the total of his prior periods of service and current service equals fifteen years or more; or

(d) Retirement with pension under Section IV of the Pension and Retirement Plan if the retired former employee is reemployed and his pension payments are suspended during reemployment.

(e) For employees reemployed after March 1, 1997, or awaiting a service cure on March 1, 1997, following a break in service, prior service will be taken into account immediately upon reemployment.

V.   BOARD OF BENEFITS AND PENSIONS

1.   The Board of Benefits and Pensions of the Du Pont Company, or its delegate, may cure breaks in continuity of service in any case where it shall determine that such action is within the spirit of these Rules and may grant such service credit with respect to the absence or separation as shall be deemed appropriate in the circumstances.

2.   Unusual cases which the Board of Benefits and Pensions finds not to have been provided for by these Rules shall be determined consistent with the spirit of these Rules and the equitable administration of the Company's Industrial Relations Plans.

3.   The Board of Benefits and Pensions retains discretionary authority to determine eligibility for service credit hereunder and to construe the terms and conditions of these Rules. The decision of the Board in all matters involving the interpretation and application of these Rules shall be final.

VI. MODIFICATIONS

These Rules may be modified from time to time by the Du Pont Company or by written instrument executed by such person or persons as the Du Pont Company may designate.

D000324

```
 1    with employment and benefit selection.
 2        Q.   Okay.  And what's the date of this
 3    document, sir?
 4        A.   October 30th of 1991.
 5        Q.   And did you receive this letter as a
 6    Nason employee?
 7        A.   Well, that's a, that's a double-edged
 8    question there.  And I have two answers for it.
 9    One is yes, because I have marked it "received."
10    But I did not receive it until 2004.  I did not
11    receive it in 1991.
12        Q.   How did you receive it in 1994 (sic)?
13    How did that come about?
14        A.   There's a gal by the name of Patty
15    Drysdale, who is our DuPont Performance
16    Coatings -- I guess you would call her the human
17    resources assistant administrator.  She works
18    directly for the human resource boss.
19             And I received this as a result of
20    my processing my retirement request.  And when I
21    found out that they said I can't have retirement,
22    this is when I received it.  She went into the
23    Nason file, plucked that out, and handed it to me,
24    along with one other document.
25        Q.   So you did not receive this letter in
```

Page 20

```
 1            meet the 15-year eligibility requirement?
 2        A.  Yes, that's correct.
 3        Q.  Okay.
 4        A.  May I ask a question of you?
 5        Q.  No.  Unless you need me to clarify
 6            something; otherwise, no.
 7        A.  Yeah, to clarify something.
 8        Q.  Okay.
 9        A.  I just want to know if during this
10            proceeding that I can address my attorney or if
11            that's not the way the rules are set up.
12        Q.  No.  Unfortunately --
13        A.  In other words, if I need to ask him a
14            question, it's not appropriate for this
15            deposition?
16        Q.  No, it's not, Mr. Mata.
17        A.  Okay.
18        Q.  You may not consult your counsel during
19            the course of the deposition.
20        A.  Okay.  Thank you.
21        Q.  Uh-huh.
22            MS. DiLUZIO:  I don't have any
23            further questions.  Thank you, Mr. Mata.
24            Mr. Stull, do you have any?
25            MR. STULL:  I have some redirect
```

March 16, 2006

Mike V. Mata

Wilmington, DE

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400        Washington, DC 20005

```
 1              questions.
 2              MS. DiLUZIO:  Sure.
 3              (Discussion held off the record.)
 4              BY MR. STULL:
 5         Q.   Mr. Mata, are you good to go for
 6    another --
 7         A.   Yes.
 8         Q.   -- half hour or so?
 9         A.   Yes.  I'm somewhat...
10         Q.   Okay.  Mr. Mata, I'm your attorney.
11    This is a redirect clarifying effort in your
12    deposition.  I'd like to ask you to review briefly
13    the submissions that were made to DuPont.  You
14    have material with five tabs to it.  Are you in
15    possession of that?
16         A.   I guess my copy -- or it's their copy.
17         Q.   That's Exhibit --
18         A.   Can I...?
19         Q.   -- 6.
20         A.   Okay.  I got it now.
21         Q.   Okay.  Please turn to Tab 1.
22         A.   Okay.
23         Q.   And tell me what your understanding is
24    regarding this notification from DuPont to you
25    regarding your adjusted service date.
```

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400
Washington, DC 20005

1111 14th Street, NW Suite 400                Alderson Reporting Company                Washington, DC 20005
1-800-FOR-DEPO

```
 1        A.   My understanding of it is that they're
 2   telling me they've made an error and they're now
 3   correcting it back to the original hire date of
 4   Nason.
 5        Q.   And what date is that?
 6        A.   May of '89, May 8th.
 7        Q.   Did you request that correction?
 8        A.   No.
 9        Q.   And what does the second sentence of
10   that first paragraph say?
11        A.   The reason for the change is manual
12   correction.
13        Q.   And the second paragraph says there are
14   a number of possible reasons?
15        A.   Yes.
16        Q.   And what do they state in that?
17        A.   They give the example of may reflect a
18   new date or one or more leave of absences that you
19   were rehired or, or employment status changed,
20   credited for prior service or your prior service
21   date was inaccurate.
22        Q.   Okay.  And you're saying you didn't
23   request that change yourself?
24        A.   No.  I -- no.
25        Q.   Now, in Tab 4 of Exhibit 6, would you
```

Wilmington, DE

Mike V. Mata                                                                          March 16, 2006

1      please refer to that and tell me what your

2      understanding is of this, 4.

3      A.  Okay.  This is the official termination

4      form naming the instructions and, and how the

5      company's supposed to carry out the separation.

6      Q.  It says, Last day worked.  And is that

7      correct, June 30, '04?

8      A.  Yes.

9      Q.  Termination reason:  Lack of work; is

10     that your understanding?

11     A.  Yes.

12     Q.  Page 2 of that form has your signature

13     on it.  And then the first block of information,

14     it says what, termination reason?

15     A.  Okay.  The termination reason it gives

16     as career transition program.  And I don't know

17     what the PN stands for.  I assume it has to do

18     with "pension eligible," which is the hyphenated

19     next words.

20     Q.  Who conducted this interview?

21     A.  My supervisor, Ross Morgan.

22     Q.  Did he initial this form?

23     A.  Yeah; he signed it at the end there, as

24     the exit interviewer.

25     Q.  Okay.  Now, when you looked at that,

Page 94

```
 1   what was your understanding of "pension eligible"?
 2        A.   Well, that, that's just that, that I
 3   was pension eligible and should look into it.
 4        Q.   Now, when you look at the fourth page
 5   under Tab 4, it's entitled "Expression of
 6   Interest."
 7        A.   Fourth page, Tab 4.
 8        Q.   Exhibit 6.
 9        A.   Okay.  All right.
10        Q.   Now, paragraph No. 1 says, I wish to be
11   considered for involuntary termination of my
12   employment with DuPont?
13        A.   Yes.
14        Q.   Is that your understanding?  Is that
15   what it says?
16        A.   Yeah.  That's what it says, yes.
17        Q.   Now, did you seek to be involuntarily
18   terminated from your employment with DuPont?
19        A.   No.
20        Q.   In other words, this was part of a form
21   that you signed?
22        A.   Right.  I had no choice in the matter.
23   This was a formality to make sure that -- my boss
24   advised me not to, not to pass it up because if
25   something went wrong and they decided they were
```

1111 14th Street, NW Suite 400                    1-800-FOR-DEPO                    Washington, DC 20005
Alderson Reporting Company

```
 1    going to yank the CTP away from you, for whatever
 2    reason, at least now, even though it's only a week
 3    away or so, you'll have a shot at letting them
 4    know that you want it.
 5         Q.   "Want it" meaning what?
 6         A.   That you want to be considered for the
 7    career transition program benefits.
 8         Q.   Okay.
 9         A.   There's always a needle-in-the-haystack
10    chance that something could come along and say,
11    "Well, Mata's not -- we don't want to give it to
12    him."
13         Q.   Is it fair to say that you felt coerced
14    into signing this?
15         A.   Yes.  Yes, it's a fair statement, that
16    I felt it was definitely the wise thing to do and
17    that I would be risking a lot if I did not do it.
18         Q.   And the last tab on the Exhibit 6 is
19    Tab 5.  Would you give me your impression of what
20    this format indicates?
21         A.   Okay.  For this, for this national
22    sales meeting, it was a million-dollar meeting,
23    quote, unquote, that had everybody in the company
24    there, a couple thousand people, probably.
25    And the core business and all the
```

Mike V. Mata                                                                      March 16, 2006
Wilmington, DE

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400
Washington, DC 20005

1  various SBUs -- or segments in the SBU were all
2  there for camaraderie and to get the overall
3  results for the year.
4        And then the breakout sessions,
5  each business unit is going to get together and do
6  that.  And then the big boys go around
7  one by one and try to visit the little breakout
8  sessions.
9        Q.   I'm directing your attention to Safety,
10 comma, Benefits, comma, Q and A by F.J. Lutz.  Did
11 you attend that meeting?
12       A.   I was at that meeting, yes.
13       Q.   What was your remembrance, what was
14 your memory of what went on at that meeting?
15       A.   My memory of Frank Lutz speaking at
16 that meeting was that he was just the guy that
17 should be included to kind of brush over and show
18 support to the group for -- there's the benefits
19 guy.  That's, that's -- from the, from the -- we
20 were estranged from DuPont at that time.
21       And Frank Lutz was -- we were
22 considered kind of like second-class citizens.  So
23 having Frank Lutz there, I think, was a good way
24 of making us feel like we were part of the gang,
25       even though we really --

```
 1        Q.   Did he discuss pension?
 2        A.   No, he didn't discussion pension, no.
 3             He was brushing over benefits questions and
 4             answers.
 5        Q.   And nobody asked anything about
 6             pensions?
 7        A.   No, we didn't.  Didn't come up.
 8             Because we were brand new.  They were there to...
 9        Q.   DuPont has referred to Exhibit 3, which
10             is a summary plan description of the pension and
11             retirement plan.  Did you -- it's dated July 1998.
12             Did you receive it in 1998; do you recall?
13        A.   Could I see that one copy back?  Is
14             that okay.  If I...
15             You know, when they're printed like
16             this, they don't look the same as they do when
17             they're in booklet form.  So that's --
18        Q.   Is that one of those book --
19        A.   I'm sure it's one of --
20        Q.   -- binder material forms?
21        A.   Yeah.  I'm sure it's one of the things
22             we have in our file, but it doesn't look the same
23             when it's --
24        Q.   It's in the binder?
25        A.   I'm pretty sure it is, John.
```

Page 97

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400
Washington, DC 20005

Mike V. Maia
March 16, 2006
Wilmington, DE

1111 14th Street, NW Suite 400   Alderson Reporting Company   Washington, DC 20005
1-800-FOR-DEPO

```
 1        Q.    Well, we're going to provide the
 2   binder, so if it's in there...
 3         Okay.  Let's see.
 4        A.    Oh, no, this wouldn't be in the binder.
 5        Q.    This Exhibit 3 is not in the binder?
 6        A.    Not in the binder, the human resources
 7   binder that we were given in our introduction to
 8   the company.
 9        Q.    I just referred to the Tab 4 document
10   under Exhibit 6, which included a last page
11   entitled Expression of Interest.  That particular
12   page was also marked Exhibit 4; is that your
13   understanding, Mr. Mata?
14        A.    Well, it's got be right here.  But
15   it's...
16        Q.    I believe...
17        A.    I don't know what happened to 4, but...
18        Q.    Well, take my word for it, it is the
19   same.
20        A.    Okay.
21        Q.    Now, that form, again, either Exhibit 4
22   or page 4 under Tab 4, which is a tab in Exhibit
23   6, again, contains a statement that you are
24   considered for involuntary termination.  But I'd
25   like to ask you, again, is that something you felt
```

Mike V. Mata   Wilmington, DE   March 16, 2006

1111 14th Street, NW Suite 400
Alderson Reporting Company
1-800-FOR-DEPO
Washington, DC 20005

```
 1   required to do or felt that you had voluntarily
 2   wanted to quit your job?
 3        A.   No.  It was something that, that I
 4   would have been a fool not to do.
 5        Q.   Okay.  You were coerced, in other
 6   words?
 7        A.   Yes.
 8             MS. DiLUZIO:  Objection.  You are
 9   on redirect, John.  You need to have direct
10   examination.
11             MR. STULL:  Okay.  This is
12   redirect.
13             BY MR. STULL:
14        Q.   But counsel also asked you about this
15   form prior --
16        A.   Yes.
17        Q.   -- in prior testimony.
18             As a part of your CTP benefit,
19   counsel asked you to describe that benefit, I
20   believe.  And what's your description of the CTP
21   benefit in terms of years of service and
22   calculation of your lump sum?
23        A.   I was very, very clear that it's the
24   same policy for everybody.  It's 15 years and 50
25   is the magic numbers for early retirement.
```

Page 99

```
 1    Q.  Now, when you receive a CTP lump-sum
 2   benefit, is there a reference in the material
 3   counsel provided to you about what your CTP
 4   benefit would be as a lump-sum severance?
 5    A.  I don't think the CTP booklet has been
 6   presented here as an exhibit, has it?
 7    Q.  I believe it's been presented in
 8   Exhibit 6.
 9    A.  Okay.  I'm dropping the ball here.  I
10   don't recall seeing it here.  Let's see.  You mean
11   in your --
12    Q.  In Exhibit 6, which was --
13    A.  Oh, I'm sorry.  I'm sorry.  I thought
14   you were talking about the documents that opposing
15   counsel handed me.  Oh, they are.  Okay.  All
16   right.  Here, John.
17    Q.  Do you have that Tab 3 portion of that?
18    A.  Okay.
19    Q.  It's your response.
20    A.  Oh, I see it now.
21    Q.  Your response regarding the benefit
22   option package was described as -- on page 2 of
23   that Tab 3, Exhibit 6, I'm going to ask you to
24   review that language that says you are eligible to
25   receive seven monthly payments of $5,008.33.  Did
```

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400        Washington, DC 20005

1111 14th Street, NW Suite 400
Alderson Reporting Company
1-800-FOR-DEPO
Washington, DC 20005

```
 1        you receive seven monthly payments of five
 2        thousand --
 3        A.  Yes.
 4        Q.  And then it says, plus a final payment
 5        of 2,713.01?
 6        A.  Yes.
 7        Q.  You received that?
 8        A.  Yes.
 9        Q.  So that's seven months plus a half a
10        month; is that your understanding of that?
11        A.  Yes.  That's what it was, yes.
12        Q.  And --
13        A.  They gave me seven and a half months of
14        pay and insurance.
15        Q.  How did they calculate that?  Do you
16        understand how they calculated that?
17        A.  Yes, I do.
18        Q.  What's your understanding of how they
19        calculated --
20        A.  For every two years of service, you get
21        a month's pay.
22        Q.  So seven and a half months calculates
23        to how many years' service, in your mind?
24        A.  15.
25        Q.  Oh.  And that's service with DuPont; is
```

```
 1        that your understanding?
 2        A.    It is DuPont service, yes.
 3        Q.    I also asked you to refer to Exhibit 1,
 4   which was dated October 30, 1991.
 5        A.    Okay.  I've got that.
 6        Q.    You have that reference?
 7        A.    Yes.
 8        Q.    Can you recite the opening or
 9   introduction of that?
10        A.    Yes.  It says, Enclosed is all of the
11   information needed for you to complete the process
12   of becoming a DuPont employee.  It is very
13   important that you take the time to read all this
14   information.  Complete and enclose -- complete the
15   enclosed forms and return the package immediately.
16   Any delays could cause problems in receiving your
17   first paycheck on the (sic) time and with the
18   proper taxes deducted.
19        Q.    Was that sent to you specifically?
20        A.    No.
21        Q.    When did you receive it?
22        A.    I received it around June, first week
23   of June from Patty Drysdale.
24        Q.    First week of June of what year?
25        A.    Of 2004.
```

1111 14th Street, NW Suite 400    1-800-FOR-DEPO    Washington, DC 20005
Alderson Reporting Company

1    Q.   Oh.  Now, Exhibit 2, I'll refer you to
2    September 25, 1992, dated notation.  What's the
3    title of that notice?
4    A.   This is called the first year of
5    service benefits letter.
6    Q.   To whom was that directed?
7    A.   It's directed to Nason employees.
8    Q.   Did you ever receive that in 1992?
9    A.   No.
10   Q.   When did you receive that one?
11   A.   I saw it for the first time from Patty
12   Drysdale in that same week, around -- on or about
13   June 8th, that week.
14   Q.   Now, in the second paragraph, please
15   read that paragraph.
16   A.   When Nason employees joined DuPont on
17   November 1 of 1991, they were granted DuPont
18   severance -- or service, excuse me -- they were
19   granted DuPont service except for pensions and
20   severance pay for their years of Nason employment.
21   Q.   Okay.  Did you receive severance pay?
22   A.   Yes, I did.
23   Q.   So there's an inconsistency -- I don't
24   want to put words in your mouth.  But why would
25   you understand you were getting severance pay

1    if --

2    A.    This was the focal point of why I

3    decided to file a lawsuit against DuPont.  Because

4    this is one of the main areas here that, as a

5    layperson, I'm looking at it.  They're saying

6    except the pensions and severance -- and as a

7    layperson, why one and not the other?  Why not

8    pension and not severance?  Why severance and not

9    pension?  What's the -- and I -- that...

10    Q.    You were confused?

11    A.    Yes.

12    Q.    Is that what you're saying?

13    A.    Yes.  I felt betrayed by the whole

14    thing.

15    MS. DiIUZIO:  I'm going to object,

16    again, to the leading questions.

17    MR. STULL:  Objection noted.

18    BY MR. STULL:

19    Q.    On Tab 1, again, Exhibit 6, there is a

20    letter directed to you personally.  It says

21    January 31, 2000.  Do you have that in front of

22    you?

23    A.    (Indicating.)

24    Q.    "Dear Mike"?

25    A.    Yes.

Mike V. Mata

March 16, 2006

Wilmington, DE

Page 104

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400

Washington, DC 20005

Page 105

```
 1      Q.  Adjusted service date.  It says it's
 2   been changed from November 1, '91, to May 8, 1989.
 3      Is that your understanding --
 4      A.  Yes.
 5      Q.  -- of what it says?
 6      A.  Yes.  I remember.
 7      Q.  And what's the difference?  How many
 8   years is it from 1989 to 2004?
 9      A.  It's 15 --
10      Q.  15 --
11      A.  -- point two.
12      Q.  Is that your understanding -- in other
13   words, your understanding is this indicates you've
14   got an adjusted service date of 15 years?
15      A.  Yes.  They're not --
16      Q.  When did you leave -- what was your
17   testimony about when you left DuPont, termination?
18      A.  You mean with regard to --
19      Q.  June?  May?  2004?
20      A.  Yes.  When I left there, there was no
21   question about the fact that I had 15 years --
22      Q.  In your mind?
23      A.  -- at DuPont.
24      In DuPont's mind, too.  They told
25   me that they're not refuting that.  They've said
```

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400          Washington, DC 20005

1     it in their response.

2          Q.   Is there a logo at the top of that

3     piece of paper?

4          A.   The one --

5          Q.   (Indicating.)

6          A.   Yes, there is.

7          Q.   What is that logo?

8          A.   It's the DuPont logo.

9          Q.   Now, page 2 of Tab 2 of Exhibit 6,

10    what's the date on that?

11         A.   It's January 23rd, 2004.  But like I

12    said before, that's incorrect.

13         Q.   What's your understanding of the date?

14         A.   I think it's a date that they only

15    update probably biannually as the, as the

16    information in their template here may change.

17    Because I couldn't have gotten it by then because

18    we weren't discussing any of this at that point.

19         Q.   I'd like to focus your attention to the

20    fourth block of information, "information from our

21    records."  Do you see that?

22         A.   Yes.  Yes.

23         Q.   What's that first reference line,

24    original hire date?

25         A.   It says original hire date is May 8th

1111 14th Street, NW Suite 400    Alderson Reporting Company    Washington, DC 20005
1-800-FOR-DEPO

1111 14th Street, NW Suite 400
Alderson Reporting Company
1-800-FOR-DEPO
Washington, DC 20005

```
 1              of 1989.
 2       Q.  Okay.  Now, what's the next line say?
 3       A.  Next line says the adjusted service
 4    date is May 8th of 1989.
 5       Q.  And then the fourth line, it says what,
 6    vesting?
 7       A.  Vesting service separation is 14.2.
 8       Q.  And then what's your understanding of
 9    the fact that they've mentioned 1989 in this
10    context?
11       A.  I think they mentioned 1989 because
12    that's the truth.  They gave us all of our Nason
13    time.  And they're, they're correcting themselves.
14    They're stating it.
15       Q.  Which means what as far as your years
16    of service?
17       A.  Well, that once, once you hit the tenth
18    year and your vacation starts to mount up, you're
19    going be looking at that and people are going to
20    be clapping for you every time that you have a
21    service anniversary, that you're getting closer to
22    better things at DuPont.
23       Q.  When was your actual separation date,
24    do you recall?
25       A.  July 1st of 2004.
```

Page 107

1111 14th Street, NW Suite 400    1-800-FOR-DEPO    Washington, DC 20005
Alderson Reporting Company

```
 1       Q.   Now, you had mentioned an individual by
 2    the name of Lendle Bean?
 3       A.   Yes.
 4       Q.   And who's Mr. Bean?
 5       A.   He's the director of human resources
 6    for DuPont Performance Coatings at Barley Mill
 7    Plaza in Wilmington.
 8       Q.   What was your contact with Mr. Bean?
 9       A.   My contact with Mr. Bean, if you mean
10    specifically about this, this issue right here
11    with Patty and our discussions and all that,
12    Lendle knew that I was, was extremely upset and
13    that I had more or less demanded a conference with
14    him.
15            And his comment to me was, when I
16    went to the going-away party for everybody, "I'm
17    surprised to see you here.  Didn't I know
18    whether I should -- you were going to slug me or
19    throw your arms around me or whatever."
20            And he, he just made the one
21    comment that, you know, "Mike, we couldn't
22    possibly have given you a pension because Nason
23    didn't have one."
24       Q.   He said Nason didn't have one?
25       A.   Yeah.
```

```
 1            Q.   Is that --
 2            A.   Yeah.
 3            Q.   And --
 4            A.   That's the -- after all the scrimmaging
 5     with Patty and everybody else, then he, being the
 6     manager, just after it was all settled and I was
 7     calmed down, well, they didn't have one, so they
 8     couldn't have given you one.
 9            Q.   Did he ever explain why your adjusted
10     service date was 1989?
11            A.   No.
12            Q.   Can you tell me what your understanding
13     is of the DuPont Connection reference versus Board
14     of Benefits and Pensions?
15            A.   Yeah.  That's, that's a -- the one doc,
16     document that -- I'm sorry.  Your name is
17     -- pronounced --
18            MS. DILUZIO:  Diluzio.
19            THE WITNESS:  Okay -- that
20     Ms. Diluzio handed me, and I tried to say that it
21     is based on three things but that I couldn't
22     find it in the document you handed me but that I
23     knew it was there.  I'm looking at it now, what
24     those three things are.
25            Well, I guess I should, I should
```

Page 109

1111 14th Street, NW Suite 400

Alderson Reporting Company
1-800-FOR-DEPO

Washington, DC 20005

Mike V. Maia

Wilmington, DE

March 16, 2006

Case 1:05-cv-00423-KAJ   Document 39   Filed 05/02/2006   Page 32 of 38

1111 14th Street, NW Suite 400
1-800-FOR-DEPO
Alderson Reporting Company
Washington, DC 20005

Page 110

```
 1            Just stay on track here.  Say again, John.
 2      BY MR. STULL:
 3            Q.   Well, was there an explanation of the
 4      difference between your contact with DuPont
 5      Connection versus DuPont and the Board of Benefits
 6      and Pensions?
 7            A.   Yeah.  There were very -- it was
 8      contradictory.  And --
 9            Q.   Oh.
10            A.   And as far as I'm -- well, my, my, what
11      I say here about it is what I believe, that they
12      were, I don't want to say deceitful.  But they
13      were, they were, they were not acting in good
14      faith or they wouldn't have, they wouldn't have
15      done what they did to base this thing on three
16      wrong contentions.
17            And that's what I feel about, about
18      my letter to Mr. Lesser and then his response and
19      their response.  And the whole, the whole thing,
20      the one answer to the Level 2 appeal, I think it
21      is, is completely wrong in, in -- it's all right
22      here, the reasons why.  And I can't imagine that
23      someone could refute that because it's in writing
24      already, in the letter I sent to him and in their
25      letter to me...
```

Wilmington, DE

March 16, 2006

```
Page 111
 1         Q.   Confusing?
 2         A.   Yeah.  He -- well, it was wrong too.
 3    He's incorrect.  And, and, and to
 4    say he would do one thing and then do the
 5    opposite.
 6         MR. STULL:  I have no further
 7    questions.
 8         THE WITNESS:  Okay.
 9         BY MS. DiLUZIO:
10         Q.   Couple follow-up questions, Mr. Mata --
11         A.   Yes.
12         Q.   -- just picking up on what you were
13    just talking about.
14              At the end of the day, you did
15    receive a review of your appeal by DuPont Board of
16    Benefits and Pensions; correct?
17         A.   At the end of what --
18         Q.   Well --
19         A.   At the end of the process?
20         Q.   Yes.
21         A.   Yes.
22         Q.   Okay.  Going back to Exhibit 6, Tab 4,
23    that second page that Mr. Stull was asking you
24    about --
25         A.   Okay.
```

1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005
Alderson Reporting Company

Page 112

```
 1    Q.    -- it says, Termination reason.  And
 2    there's a little X marked next to the line that
 3    says, CTP, dash, pension eligible.
 4    A.    Right.  I see it.
 5    Q.    You said that Ross Morgan put that X
 6    there?
 7    A.    Yes.
 8    Q.    And he was your direct supervisor?
 9    A.    Yes, he was.
10    Q.    Was Mr. Morgan an HR representative or
11    involved with the pension --
12    A.    No.
13    Q.    -- calculations in any way?
14    A.    No.  No.  He was a product platform
15    manager.
16    Q.    Does this document say anywhere that
17    you're eligible for early retirement benefits?
18    A.    Doesn't mention early retirement
19    benefits; just says I'm pension eligible.  So, no,
20    I guess the answer would have to be.
21    MS. DiLUZIO:  Okay.  No further
22    questions.
23    (Deposition concluded at 4:28 p.m.)
24
25
```

# Pension and Retirement Plan

## Optional Retirement At Involuntary Termination

The pension plan may also provide benefits for full-service employees who are terminated involuntarily. If you are terminated involuntarily (other than when your employment is terminated to permit you to be employed by the buyer of Company assets, a joint venture of the Company, or for a service provider or you are terminated for dishonesty, insubordination, or other misconduct), but are over age 50 with at least 15 years of service, you are eligible for an optional pension.

If you are terminated involuntarily for lack of work and have at least 25 years of service, you may be eligible for an optional pension as early as age 45. The 25-year service requirement is reduced by two years for each year past your 45th birthday.

| AGE | SERVICE REQUIRED |
|-----|-----|
| 45 | 25 |
| 46 | 23 |
| 47 | 21 |
| 48 | 19 |
| 49 | 17 |
| 50 | 15 |

If you qualify for optional retirement, your pension is calculated by the three formulas shown as on page 7. The formula producing the highest benefit is used. Your benefit is then reduced by 5/12ths of 1% for each month between the time you leave and the time you would have become eligible for an unreduced pension.

Here is an example of how an optional pension is calculated.

## Incapability Retirement

As a full-service employee with at least 15 years of service, you may be able to retire with an incapability pension - if you are deemed permanently incapable of doing your job with the required degree of efficiency. If you qualify for an incapability retirement, your pension is calculated by the three formulas shown on page 7. The formula producing the highest benefit is used, and there is no reduction for early retirement. In addition, you may receive an incapability supplement equal to either:

- 50% of your Primary Social Security Benefit (PSSB); or
- $90 a month

Frank White is 54 with 23 years of service when he is involuntarily terminated. With this combination of age and service, he meets the requirements for optional retirement (over age 50 with at least 15 years' service). Under the formulas, Frank's pension is $1,300. However, he is four years (48 months) away from being eligible for an unreduced early pension per the chart on page 5 (age 58 with 27 years of service); therefore, his pension is reduced as follows:

5/12ths of 1% (.00417) times 48 months times $1,300 = $260.

Frank's optional pension is $1,040 per month ($1,300 minus $260).

9

6

# Pension and Retirement Plan

...whichever is greater. You receive this supplement until you either begin receiving a Social Security disability benefit or reach age 62, whichever is the first to occur.

More information on DuPont's disability income resources can be found in the **Disability Plans** booklet.

## YOUR PLAN BENEFIT FORMULAS

Because there are many different jobs, functions, and pay histories at DuPont, the pension plan uses three formulas to assure that your retirement income is based on your individual situation. Payments are automatically based on the formula that generates the highest pension for you. However, your benefit, as calculated under Formula A or Formula B, when added to your Primary Social Security Benefit (PSSB)—as determined at the time of your retirement—may not exceed your average monthly pay.

Formula A involves your years of service, your high-three years' pay, and a multiplier percentage.

### Formula A

1.2% x Service x High-Three Years' Pay = Your Monthly Pension

Formula B is like Formula A, but it uses a somewhat higher multiplier percentage and includes consideration of your Primary Social Security Benefit (PSSB).

### Formula B

1.5% x Service x High-Three Years' Pay - 1/2 of your PSSB = Your Monthly Pension

Formula C uses a dollar multiplier, your service, and a percentage of your average monthly pay.

### Formula C

$9 x Service + (10% of High-Three Years' Pay) = Your Monthly Pension

## DEFINITION OF SERVICE (FULL AND LIMITED SERVICE EMPLOYEES)

Your service time is important for three different purposes under the plan. The first is to determine whether you are vested, which means that benefits you have accrued under the plan are nonforfeitable (cannot lose). For full-service employees (FSEs) vesting requires 5 full years of service. For Limited Service Employees (LSEs), every time you work at least 1,000 hours in your 12-month computation period, you receive credit for a year of service toward vesting. (See page 23 for an explanation of computation periods.) Generally, you need five years of service in order to become vested in the plan.

Service is also important for the purpose of benefit accrual in the calculation of your benefit. For full-service employees (FSEs), length of service for benefit accrual purposes is "continuous service" as determined under the Company's Continuity of Service Rules.

A-36

# DETAILS OF THE PLAN

## Preface

This **Summary Plan Description (SPD)** provides a concise description of Plan coverage available for you and your eligible dependents.

While this SPD contains detailed and important information about your benefit Plan, every attempt has been made to communicate that information clearly and in easily understandable terms.

While the **Company** intends to continue the benefits and policies described in this booklet, the Company reserves the right to change, modify or discontinue the Plan at its discretion at any time. This SPD does not constitute a contract of employment or guarantee any particular benefit.

In the event of a discrepancy between this SPD and the Plan document, the Plan document will govern.

## Introduction

The DuPont Pension and Retirement Plan is designed to provide you with a lifetime retirement income based on your length of service and your earnings with DuPont.

The Plan provides four kinds of pensions for Full-Service Employees:

### Normal Retirement Pension

You can retire with a normal retirement pension if you are at least age 65 with at least 15 years of service.

### Early Retirement Pension

You are eligible to retire with an early retirement pension as early as age 50 with 15 or more years of service.

### Optional Retirement Pension

If you are involuntarily terminated, you may be eligible to retire with an optional pension at age 50 with at least 15 years of service or as early as age 45 with 25 years of service if you are terminated for lack of work.

### Incapability Retirement Pension

You may qualify for an incapability pension if the Company determines you have become permanently incapable of performing your job and you have at least 15 years of service.

---

*Planning for Your Survivors*

The DuPont Pension and Retirement Plan offers a number of options for providing income to your survivors following your death. Some of these options are paid for entirely by the Company. While DuPont is pleased to offer these Company-paid benefits to you, they are intended only to ASSIST in providing for your survivors. The ultimate responsibility for the financial well-being of your survivors rests with you rather than with the Company. You should consider their cir- cumstances carefully when making survivor benefit elections in connection with your retirement.

## Certificate of Service

I HEREBY CERTIFY THAT ON May 1, 2006, I electronically filed a true

and correct copy of the foregoing Plaintiff's Appendix Material in Support of

Opening Brief in support of Plaintiff Mike V. Mata's claims for pension benefits

with service on counsel for Defendant DuPont, using CM/ECF, with the clerk of

District Court to allow service on counsel for DuPont at:

POTTER ANDERSON & CORROON LLP
Kathleen Furey McDonough, Esq.
Sarah E. DiLuzio, Esq.
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899-0951

/s/ JOHN M. STULL
John M. Stull, Esq. (Del.Bar #568)
1300 N. Market Street, Ste 700
P. O. Box 1947
Wilmington, DE 19899
Ph. 302) 654-0399
Attorney for Mike V. Mata
jstulleg@aol.com

Dated:  May 1, 2006

~9~